**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Lung Van NGUYEN, Defendant–Appellant.**

**No. 94–10268.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 17, 1995.

Decided Dec. 19, 1995.

888

Diane Marie Amann, San Francisco, California, for defendant-appellant.

Steven F. Gruel, Assistant United States Attorney, San Francisco, California, for plaintiff-appellee.

Before: FLETCHER, REINHARDT, and NOONAN, Circuit Judges.

FLETCHER, Circuit Judge:

Lung Van Nguyen appeals his conviction for bringing aliens into the United States at a location other than a designated port of entry, in violation of 8 U.S.C. § 1324(a)(1)(A). We have jurisdiction, and we reverse because

the district court failed to instruct the jury regarding an essential element of the offense.

## I

Nguyen's arrest resulted from a federal investigation of a suspected large-scale alien smuggling scheme. Based on their surveillance of the harbor at Moss Landing, California, law enforcement agents suspected that two fishing vessels, the "Angel" and the "Pelican," were being used in an elaborate scheme to smuggle Chinese nationals into the United States and then employ them until the aliens had paid through their labor the smugglers' fees for transporting the aliens into the United States.

On May 28, 1993, the Angel and the Pelican departed together from Moss Landing, headed west. Air surveillance by the United States Coast Guard during the next few days showed that the boats were traveling parallel, about ten miles apart. The two boats eventually rendezvoused with a larger "mother ship" carrying approximately 280 Chinese nationals. The aliens were moved from the mother ship onto the Angel and Pelican and taken to the United States. The Angel arrived in Moss Landing on June 2, 1993, and a few hours later, the Pelican arrived at Pillar Point Harbor in Half Moon Bay, approximately sixty miles north of Moss Landing. After the Angel's return to Moss Landing, Coast Guard agents searched the vessel and discovered more than one hundred aliens on board. Nguyen and two other men were found sleeping in the Angel's engine room. When interviewed by an INS agent, Nguyen stated that he was the Angel's mechanic and that he "drove" the boat. The Coast Guard's search of the Pelican at Pillar Point Harbor revealed more than one hundred aliens on board that vessel.

A federal grand jury returned a five-count indictment charging Nguyen and four codefendants with various alien smuggling offenses. The indictment charged Nguyen with conspiring to smuggle illegal aliens into the United States, in violation of 18 U.S.C. § 371, and with bringing aliens into the United States at a location other than a designated port of entry, in violation of 8 U.S.C. § 1324(a)(1)(A).

At his jury trial, Nguyen's defense was that he had no idea that his venture on the Angel was part of an alien-smuggling scheme until it was too late either to prevent the smuggling or to refrain from participating in it. According to Nguyen, he had come to California from Philadelphia only for a short visit, looking for work as a squid fisherman. A man whom Nguyen met in the Vietnamese community introduced Nguyen to a Chinese man who said he had just purchased the Angel and required assistance moving it to Long Beach. Nguyen accepted the job, and the Angel left from Moss Landing.

Nguyen testified that a man named Danny was in charge of steering the Angel and that, although Nguyen did steer the boat during the course of the trip, he did so only at Danny's direction. According to Nguyen, he was following the navigation course to Long Beach when he suddenly was instructed to change course. Approximately five hours later, the Angel met the mother ship, and aliens were off-loaded onto the Angel. Danny then instructed Nguyen to return the Angel to Moss Landing.

Nguyen testified that he suspected that the people who boarded the Angel were illegal aliens, but that he did not try to stop them from boarding because some of the crew were armed. Nguyen testified that, although no one explicitly threatened him, he feared that he would be shot, dropped in the ocean, or in some other way harmed if he tried to stop the smuggling. To support his claim that he was less than a willing participant in the smuggling, Nguyen testified that he tried more than five times to call the Coast Guard for help on the Angel's radio, but that no one answered. A Coast Guard agent testified that the Angel's radios were short range and could not have been used to contact the Coast Guard.

Nguyen requested the district court to instruct the jury that it could convict Nguyen of violating 8 U.S.C. § 1324(a)(1)(A) only if it found that Nguyen had brought the aliens into the United States at a place other than a designated port of entry with the intent to evade the INS. The court rejected Nguyen's request and instead instructed the jury that

it could convict Nguyen if he brought persons into the country knowing that they were illegal aliens. The jury acquitted Nguyen of conspiring to smuggle illegal aliens, but convicted him of the substantive offense of bringing aliens into the United States in violation of 8 U.S.C. § 1324(a)(1)(A).

## II

Section 1324(a) provides a criminal penalty of up to five years imprisonment per alien for:

(1)(A) Any person who—

(i) knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien.

Read literally, then, the statute criminalizes bringing, purposefully or otherwise, any alien, illegal or otherwise, into the country other than at a designated port of entry. Nguyen contends that a literal reading of section 1324(a)(1)(A) lacks a *mens rea* requirement and, accordingly, the district court should have read into the statute the requirement of criminal intent. We agree.

## A

■ We start from the basic premise that "[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." *Liparota v. United States*, 471 U.S. 419, 424, 105 S.Ct. 2084, 2087, 85 L.Ed.2d 434 (1985). Thus, in determining what mental state is required to prove a violation of section 1324(a)(1)(A), the focus of our inquiry is the intent of Congress. *See id.* at 423–24, 105 S.Ct. at 2087–88; *United States v. Balint*, 258 U.S. 250, 253, 42 S.Ct. 301, 302, 66 L.Ed. 604 (1922).

Of course, in determining the intent of Congress, we look first to the language of the statute. The language of section 1324(a)(1)(A) is silent regarding the necessary mental element associated with the actual "bringing" of the alien into the United States. It does not, for instance, explicitly require the government to prove that the defendant intended to evade the INS by avoiding official ports of entry, or that the defendant even intended to bring the alien into the United States. The offense read literally simply requires that the defendant bring a person into the United States at a place other than a designated port of entry, knowing that the person is an alien.

However, the statute's "silence [regarding the required mental element of the offense] by itself does not necessarily suggest that Congress intended to dispense with a conventional *mens rea* element." *Staples v. United States*, —— U.S. ——, ——, 114 S.Ct. 1793, 1797, 128 L.Ed.2d 608 (1994); *accord United States v. United States Gypsum Co.*, 438 U.S. 422, 438, 98 S.Ct. 2864, 2874, 57 L.Ed.2d 854 (1978) ("Certainly far more than the simple omission of the appropriate phrase from the statutory definition is necessary to justify dispensing with an intent requirement."). Rather, we construe the statute in light of the fundamental principle that a person is not criminally responsible unless "an evil-meaning mind" accompanies "an evil-doing hand." *See Morissette v. United States*, 342 U.S. 246, 251, 72 S.Ct. 240, 244, 96 L.Ed. 288 (1952).

■ "The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." *Id.* at 250, 72 S.Ct. at 243; *see also Staples*, —— U.S. at ——, 114 S.Ct. at 1797 (at common law, "the requirement of some *mens rea* for a crime is firmly embedded"); *Dennis v. United States*, 341 U.S. 494, 500, 71 S.Ct. 857, 862, 95 L.Ed. 1137 (1951) ("The existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo–American criminal jurisprudence."). Accordingly, criminal offenses requiring no *mens rea* have a "generally disfavored sta-

tus," *Liparota,* 471 U.S. at 426, 105 S.Ct. at 2088, and we are reluctant to conclude that Congress intended to dispense with *mens rea* as an element of a crime absent some indication of congressional intent. *E.g., Staples,* — U.S. at —, 114 S.Ct. at 1797; *United States Gypsum Co.,* 438 U.S. at 438, 98 S.Ct. at 2874; *United States v. X–Citement Video, Inc.,* — U.S. —, —, 115 S.Ct. 464, 468, 130 L.Ed.2d 372 (1994) (discussing cases); *see, e.g., United States v. Semenza,* 835 F.2d 223, 224 (9th Cir.1987) (defendant could not be convicted of allowing unauthorized livestock to trespass on National Forest Land unless the government proved that the defendant acted wilfully); *United States v. Launder,* 743 F.2d 686, 689–91 (9th Cir.1984) (defendant could not be convicted of permitting a fire to burn beyond control unless the government proved a willingness on defendant's part to allow such a result).[1]

■ If after examining the statutory language and the legislative history we perceive any ambiguity regarding Congress's intent to require a showing of criminal intent, we will resolve the ambiguity by implying a *mens rea* element. *See Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."). "Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the ap-

propriate balance between the legislature, the prosecutor, and the court in defining criminal liability." *Liparota,* 471 U.S. at 427, 105 S.Ct. at 2089.

## B

■ The government argues that the legislative history to section 1324(a)(1)(A) evidences Congress's intent to dispense with a *mens rea* requirement. Congress amended section 1324(a) as part of section 112 of the Immigration Reform and Control Act of 1986 ("IRCA"). Prior to that amendment, section 1324(a)(1) punished as a felony various offenses concerning illegal aliens, including "bring[ing] into" the United States any alien "not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States." 8 U.S.C. § 1324(a)(1) (1976). The interpretation of that statute was the focus of much litigation in the early 1980s when the government obtained 84 indictments charging more than 300 defendants with violating the statute during what was dubbed the "Freedom Flotilla." These defendants carried more than 125,000 undocumented Cuban nationals on vessels from Mariel Harbor, Cuba to the United States and presented them to INS officials at Key West, Florida, so the Cuban nationals could apply for political asylum or some other status that would permit them to enter and remain lawfully within the United States.

1. The presumption against strict liability may be overcome when the statute is one "which can be termed [a] 'public welfare offense[ ],' i.e., [a] statute[ ] whose purpose is regulation of 'industries, trades, properties or activities that affect public health, safety or welfare.' " *Launder,* 743 F.2d at 689 (quoting *Morissette,* 342 U.S. at 254, 72 S.Ct. at 245). "Such public welfare offenses have been created by Congress, and recognized by this Court, in 'limited circumstances.' " *Staples,* — U.S. at —, 114 S.Ct. at 1798 (quoting *United States Gypsum,* 438 U.S. at 437, 98 S.Ct. at 2873). Typically, courts have recognized public welfare offenses in cases involving statutes that regulate potentially harmful or injurious items. *See, e.g., United States v. International Minerals & Chem. Corp.,* 402 U.S. 558, 564–65, 91 S.Ct. 1697, 1701–02, 29 L.Ed.2d 178 (1971); *United States v. Weitzenhoff,* 35 F.3d 1275, 1283–86 (9th Cir.1993), *cert. denied,* — U.S. —, 115 S.Ct. 939, 130 L.Ed.2d 884 (1995).

The government does not contend that section 1324(a)(1)(A) is a public welfare statute, nor could it. The "public welfare" exception does not extend to offenses derived from common law. *See United States Gypsum,* 438 U.S. at 437, 98 S.Ct. at 2873; *Morissette,* 342 U.S. at 255, 260–62, 72 S.Ct. at 246, 248–49. Moreover, public welfare offenses generally are ones "where the penalty is relatively small, [and] where conviction does not gravely besmirch." *United States v. Freed,* 401 U.S. 601, 613 n. 4, 91 S.Ct. 1112, 1120 n. 4, 28 L.Ed.2d 356 (1971) (Brennan, J., concurring) (quoting *Holdridge v. United States,* 282 F.2d 302, 310 (8th Cir.1960) (Blackmun, J.)); *see also Staples,* — U.S. at —, 114 S.Ct. at 1802; *Morissette,* 342 U.S. at 256, 72 S.Ct. at 246. The penalties created by section 1324(a)(1)(A) are far from minor. For instance, by imposing a penalty of up to five years imprisonment per alien, the statute exposed Nguyen to the potential of a very long term of imprisonment.

The United States District Court for the Southern District of Florida, sitting en banc, dismissed the indictments against the defendants, holding that a fraudulent or evasive "entry" into the United States by the aliens was an element of section 1324(a)(1) and could not be proven by the government because the defendants had delivered the Cuban nationals directly to INS officials. *United States v. Anaya*, 509 F.Supp. 289, 297–98 (S.D.Fla.1980) (en banc).

On appeal, the Eleventh Circuit affirmed the dismissal of the indictments but on a different basis. *United States v. Zayas–Morales*, 685 F.2d 1272, 1276–78 (11th Cir. 1982). Rather than debate whether aliens brought to an official port of entry had "entered" the United States, the Eleventh Circuit focused on the requisite state of mind to establish a violation of section 1324(a)(1). After discussing the well-established principle that criminal intent is presumed to be a required fundamental element of a serious crime in the absence of any congressional intent to dispense with a *mens rea* requirement, *id.* at 1276, the court concluded that section 1324(a)(1) required the government to prove that the defendant acted with "general intent to commit an illegal act." *Id.* at 1277. The government could not make such a showing against the participants in the Mariel boatlift because the defendants' clear intent was to submit the aliens to INS officials in full compliance with the law. *Id.* Thus, the critical fact preventing prosecution of the defendants under either the district court's or Eleventh Circuit's analysis was that the defendants had brought the aliens to INS officials.

The government argues that section 112 of IRCA was intended to ensure that, in the future, federal law would criminalize the conduct of persons like those responsible for the Freedom Flotilla. As we explain below, we agree that the legislative history indicates that Congress's intent in adopting section 112 of IRCA was to attempt to "expand the scope of activities proscribed" by federal law

to reach the conduct of those participating in such operations as the Mariel boatlift. H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 65 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5669. However, we cannot accept the government's leap from this premise to the conclusion that Congress intended to dispense with the *mens rea* requirement inferred by the Eleventh Circuit in *Zayas–Morales*.

As evidence that Congress intended to dispense with a *mens rea* requirement, the government relies on a statement in the House Report that "section 112 is designed to correct the shortcomings and ambiguities in existing law identified in *United States v. Anaya* ... and in *United States v. Zayas–Morales* as well." H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 65 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5669. The government misstates the relevance of this single sentence. As noted above, the hurdle for the government in both *Anaya* and *Zayas–Morales* was that federal law did not criminalize the act of bringing an undocumented alien to INS officials so the alien could apply for asylum. We do not see, then, how Congress could have intended for its amendment to section 1324(a)(1)(A) to remedy this problem when that statute, as amended, criminalizes bringing an alien into the country at a place *other* than a designated port of entry.

Viewed in context, the legislative history relied upon by the government clearly pertains to Congress's enactment of section 1324(a)(2), the misdemeanor offense of bringing aliens into the United States,[2] *not* section 1324(a)(1)(A), the "bringing in" felony offense at issue here. After stating that section 112 was designed to correct the shortcoming of existing law as identified in both *Anaya* and *Zayas–Morales*, the Committee on the Judiciary summarized the holdings of both decisions and concluded that

> *this gap* in current law must be closed. Without the threat of criminal prosecution, there is no effective way to deter potential transporters from *inundating U.S. ports of*

---

**2.** 8 U.S.C. § 1324(a)(2) provides a penalty of up to one year in prison for

"[a]ny person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come

to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien."

*entry with undocumented aliens.* As happened during the Mariel episode, the United States would be forced to expend extraordinary amounts of money and human resources in processing, monitoring, caring for and giving hearings to exorbitant numbers of people. *Accordingly,* the bill clarifies that a person who *knowingly transports an undocumented alien* to *any place in the United States* will be subject to criminal prosecution if that person knew the alien was undocumented or acted with wilful blindness concerning the alien's immigration status. Absent aggravating circumstances, the maximum penalty would be a fine of $5,000 and up to 1 year in jail for each transaction....

*Additionally,* the bill increases the penalties for (1) knowingly bringing aliens, whether documented or not and whether an entry occurs or not, to any place in the United States other than designated ports of entry.... [T]he maximum penalty would be a fine of $10,000 and five years imprisonment for each alien involved.

H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 66 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5670 (emphasis added).

This legislative history makes clear that Congress added section 1324(a)(2) to criminalize as a misdemeanor the conduct such as that in the Mariel boatlift. It also indicates, as does the plain statutory language, that Congress intended to expand section 1324(a)(1)(A), the "bringing in" felony, to reach not only the bringing in of undocumented aliens, but the act of bringing *any* alien (legal or illegal) into the United States, unless the defendant brought the alien to a designated port of entry. The legislative history does not, however, support the government's argument that Congress intended to dispense with a *mens rea* requirement for the felony offense in section 1324(a)(1)(A).

**C**

■ Were we to conclude otherwise, we would be left with a statute that exposes persons who perform innocent acts to lengthy prison sentences. For example, any boat operator or captain who (1) departs from the coast of California, Texas, Louisiana, or Florida with a permanent-resident alien on board as a passenger or employee, (2) enters international waters, and (3) returns to shore at a location other than a designated port of entry would risk criminal prosecution. Because the statute provides the possibility of a five-year term of imprisonment for each alien brought into the United States, the potential sentence for such a violation could be very long.

We cannot believe that it was Congress's intent in amending section 1324(a)(1)(A) to criminalize wholly innocent conduct. Certainly, there is nothing in the legislative history suggesting a desire to do so. *See Liparota,* 471 U.S. at 426, 105 S.Ct. at 2088 (court required criminal intent "where ... to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct"); *see also X–Citement Video,* ⎯ U.S. at ⎯, 115 S.Ct. at 467 (declining to adopt statutory interpretation that "would produce results that were not merely odd, but positively absurd"); *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (in determining the scope of a statute, "absurd results are to be avoided").

Prior to 1986, section 1324(a)(1) was interpreted to require "proof of a general intent to commit an illegal act." *Zayas–Morales,* 685 F.2d at 1277. This interpretation was based on well-settled common law rules of statutory interpretation. Although Congress expanded the statute in 1986 to criminalize bringing *any* alien, whether documented or not, into the United States at a place other than an authorized port of entry, we see nothing in the IRCA or its legislative history to indicate that Congress intended to dispense with the *mens rea* requirement assumed to be an element of every common law offense. Accordingly, we hold that to convict a person of violating section 1324(a)(1)(A), the government must show that the defendant acted with criminal intent.

**D**

■ In the alternative, the government argues that if *mens rea* is required, the district court did instruct the jurors to that

effect. The government is only partially right. What the judge told the jurors they must find was knowledge of the elements required by the misdemeanor statute, not the criminal intent that we hold to be required by section 1324(a)(1)(A). Arguing that a literal reading of section 1324(a)(1)(A) would criminalize otherwise innocent conduct, Nguyen urged the district court to instruct the jury that the government had to prove that Nguyen acted with criminal intent to evade the INS. The district court refused Nguyen's proposed instruction and accepted the government's alternative instruction which dealt with a (nonexistent) requirement that the entry be unlawful. In doing so, the district court apparently believed that, as the government argues here, the instruction contained a sufficient *mens rea* requirement. Unfortunately, it did not.

The district court instructed the jury that it could convict Nguyen of violating section 1324(a)(1)(A) if the government proved beyond a reasonable doubt that (1) Nguyen "brought a person or attempted to bring a person into the United States who was not a citizen of the United States," (2) the "person was not lawfully in the United States," and (3) Nguyen "knew that the person was not lawfully in the United States." The district court further instructed the jury that "a person who is not a citizen of the United States is not lawfully in this country if the person was not duly admitted by an immigration officer." The government argues that by adding to the express requirements of section 1324(a)(1) the requirements that the alien be a person not lawfully in the United States, and that the defendant know of the alien's unlawful status, the district court interpreted the statute consistent with the principles enunciated in *Morissette*.

Although the district court may have intended to inform the jury that some indication of a guilty mind was necessary, it failed to do so. It referred to a need for knowledge of certain elements (which happen to be inconsistent with the express language of the statute as well as the statute's legislative history),[3] but did not advise the jurors of any requirement that criminal intent be shown. The error appears to have occurred as a result of a failure to distinguish between the requirements of the misdemeanor and felony provisions applicable to the transporting of aliens into the United States. What the district court mistakenly did, at the government's urging, was to instruct the jury on the knowledge requirements of the misdemeanor statute, rather than instruct it on the criminal intent required by section 1324(a)(1)(A). The jury should have been instructed that it must find that the defendant knew that the individuals were aliens and that he off-loaded them at other than a port of entry, intending to violate the law. Knowledge and criminal intent are both required.

### III

The government bears the burden of proving each element of an offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). In order for a criminal defendant to be lawfully convicted, a jury must find that the government carried that burden with respect to each of the elements of the crime with which he is charged. *See United States v. Gaudin*, —— U.S. ——, ——, 115 S.Ct. 2310, 2314, 132 L.Ed.2d 444 (1995), *aff'g* 28 F.3d 943 (9th Cir.1994) (en banc). In Nguyen's case, the Constitution required that the jury find criminal intent beyond a reasonable doubt,[4] but the district court's instruction omitted that element.

---

**3.** Section 1324(a)(1)(A) clearly states that a person commits a felony by bringing an alien into the United States other than at a port of entry, *"regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien."* 8 U.S.C. § 1324(a)(1)(A) (emphasis added). Moreover, the legislative history reveals that the provision applies to "knowingly bringing aliens, *whether documented or not* ..., to any place in the United States other than

designated ports of entry." H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 66 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5670.

**4.** Criminal intent is no less an element of the offense here than if it had been expressly provided for in the statute. *See Gaudin*, 28 F.3d at 948 ("When a statute expressly provides for materiality as an element of the crime, it can hardly be said that it is not an element. If, in construing the intent of Congress, the courts determine that materiality was intended by Congress to be an

We have no doubt that the instructional error requires reversal. As in *Gaudin*, the jury was precluded from considering whether an essential element existed. *Gaudin*, 28 F.3d at 951. Here, we could find the error harmless only if a jury determination of some sort necessarily established that it had found that Nguyen acted with the requisite intent. *See Sullivan v. Louisiana*, 508 U.S. 275, ——, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); *Carella v. California*, 491 U.S. 263, 268–69, 109 S.Ct. 2419, 2421–22, 105 L.Ed.2d 218 (1989) (Scalia, J., concurring). No such independent determination exists. Accordingly, reversal is required.

## CONCLUSION

To convict a defendant of bringing an alien into the United States at a place other than an authorized port of entry, the government must prove beyond a reasonable doubt that the defendant acted with the intent to commit a criminal act. The district court failed to instruct the jury on this element of the offense, and the omission from the instruction was not harmless. Accordingly, we reverse the defendant's conviction and remand for a new trial.

REVERSED and REMANDED.

element of the crime, a similar result would seem apparent.'') (citation omitted).