**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Amelia BARAJAS–MONTIEL,
Defendant–Appellant.**

**No. 98–50147.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 3, 1999.

Decided July 13, 1999.

Sylvia Baiz, San Diego, California, for the defendant-appellant.

Bruce R. Castetter, Assistant United States Attorney; Michael P. Skerlos, Assistant United States Attorney; San Diego, California, for plaintiff-appellee United States of America.

Before: HUG, Chief Judge, BROWNING, Circuit Judge, and ZILLY,[1] District Judge.

ZILLY, District Judge:

Amelia Barajas–Montiel appeals her conviction and sentencing for several alien smuggling offenses. She challenges the jury instructions given, the sufficiency of the evidence against her, and the imposition of a role enhancement as part of her sentence. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## I. BACKGROUND

Appellant Amelia Barajas–Montiel ("Amelia" or "Barajas") resided at 2121 Osborn Street, in San Diego, with her daughter Cynthia Lozano, her boyfriend

Raul Esquivel–Castillo ("Esquivel"), and his daughter Erika. Amelia co-owned this residence with her sister Yolanda. On May 20, 1997, agents observed Amelia and her brother Everardo Barajas ("Everardo") conferring in front of the house at 2121 Osborn Street. Everardo then drove away in a white Chevrolet Celebrity with a "lifted" suspension, and Amelia followed in a white Mercury Grand Marquis. The vehicles traveled in tandem for about half an hour, then separated at a fairly remote location. Approximately ten minutes later, when the Celebrity reappeared, its suspension no longer appeared lifted. Agents followed this car to a house at 1132–27th Street, San Diego, which was also under surveillance. Eight to ten Hispanic males, who had not previously been visible, exited the Celebrity and hurried into the house. Meanwhile, the Mercury returned to the house at 2121 Osborn, with Amelia driving and Everardo as a passenger.

The following night, surveillance revealed very similar activity. Everardo and Amelia drove separate cars in tandem, one of which had a lifted suspension. The cars separated, and when the Celebrity reappeared, its suspension was no longer lifted. That car traveled to 1132–27th Street, where several passengers not previously visible exited the vehicle and entered the house. Amelia and Everardo reappeared in the other vehicle at 2121 Osborn Street. On at least one of these nights, agents also observed Amelia and Everardo pumping air into the rear of the Celebrity to lift its suspension.

On June 2, 1997, agents observed Esquivel raising the suspension of a blue Celebrity with a gas station air pump. Esquivel then drove to 2121 Osborn, where Amelia pushed on the car's rear bumper, apparently to test its suspension. Shortly thereafter, Esquivel, Amelia and Everardo set out, all driving different vehicles, and followed the same route as on the previous evenings. The two Celebrities later ar-

---

1. The Honorable Thomas S. Zilly, District Judge, United States District Court for the Western District of Washington, sitting by designation.

rived at 1132–27th Street, where agents apprehended twenty undocumented aliens. Six of these aliens testified at trial as material witnesses. Their testimony established that they had been led across the United States–Mexico border by three co-defendants in this case, Miguel Angel Galvez–Catedral ("Galvez"), Jose Chavez–Mendoza ("Chavez"), and Oscar Perez–Ayon ("Perez").

A few moments after the arrests began at 1132–27th Street, Esquivel, Amelia and Everardo returned to 2121 Osborn Street, where they were apprehended. A search warrant was executed at 2121 Osborn Street, revealing numerous records and over $8000 in United States currency. Many of the records were in Ms. Barajas's name, and her name appeared repeatedly in the ledgers found during the search. Agents also found a rent receipt for the 1132–27th Street residence in her possession. Additionally, several United States and Mexican identification documents were found in a ceramic vase on a night-stand next to a bed in one of the bedrooms.

The grand jury indicted Amelia, Everardo, Esquivel, Chavez, Perez, and Galvez on June 13, 1997; a superceding indictment was issued on June 20, 1997.[2] Appellant was convicted of one count of conspiracy to bring in and transport illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii); six counts of bringing in illegal aliens for financial gain in violation of 8 U.S.C. § 1324(a)(2)(B)(ii); six counts of transportation of illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(II); and one count of possession of five or more false identification documents in violation of 18 U.S.C. § 1028. The trial court sentenced Barajas to sixty-three months in prison.[3] At sentencing, Barajas was given a four-level role enhancement pursuant to United States Sentencing Guideline § 3B1.1(a) for being an organizer or leader.

Appellant now challenges the jury instructions given regarding counts two through five and eight through thirteen, contending that they failed to require the jury to find that she specifically intended to violate United States immigration laws, as allegedly required by statute. The instructions on counts two through five did not include this element, but appellant did not object at trial and the omission of this instruction was not plain error, so her conviction as to these counts is affirmed. The instructions on counts eight through thirteen did contain such an intent provision, and we therefore affirm as to those counts. Barajas also challenges the sufficiency of the evidence. Her argument that the government failed to present sufficient evidence that the material witnesses were illegal aliens, as required for conviction of counts two through five and eight through thirteen, has no merit. She is correct, however, that the evidence presented was insufficient to establish her constructive possession of the false identification documents at issue in count fourteen, so we reverse her conviction on that count.[4] Finally, we reject appellant's contention that the government did not establish that she controlled other people, as required for imposition of the sentencing role enhancement. We therefore affirm in part, reverse in part and remand for re-sentencing.

## II. JURY INSTRUCTIONS

Appellant challenges the sufficiency of the jury instructions given on counts two through five, bringing in illegal aliens for financial gain, and counts eight through thirteen, transporting illegal aliens. At trial, she asked for an instruction on spe-

---

**2.** We affirmed the sentences of Chavez and Perez in a separate memorandum disposition.

**3.** At sentencing, the trial court also dismissed counts six and seven for reasons not relevant to our disposition.

**4.** In light of this holding, we do not need to reach appellant's claim that the evidence was insufficient to prove that she intended to use the documents unlawfully.

cific intent for all these counts, but then failed to object to the instructions as given.

■■■ A district court's formulation of jury instructions is reviewed for abuse of discretion. *United States v. Kessi*, 868 F.2d 1097, 1101 (9th Cir.1989). The inquiry is "whether the jury instructions as a whole are misleading or inadequate to guide the jury's deliberations." *United States v. Joetzki*, 952 F.2d 1090, 1095 (9th Cir.1991). Whether a jury instruction misstates elements of a statutory crime is a question of law subject to de novo review. *United States v. Mann*, 811 F.2d 495, 496–97 (9th Cir.1987).

## A. Specific Intent Under Section 1324(a)(2)(B)

Section 1324 of United States Code Title 8 contains two different provisions making it illegal to "bring in" aliens to the United States. The first of these, 8 U.S.C. § 1324(a)(1)(A)(i), makes it a crime to bring in or attempt to bring into the United States an alien, knowing that the person is an alien, at a place other than a designated port of entry.[5] The second provision, 8 U.S.C. § 1324(a)(2), under which Ms. Barajas was charged and convicted, makes it a crime to bring an alien into the United States knowing or in reckless disregard of the fact that the alien has not received official permission to enter.[6] Section 1324(a)(1)(A) hinges on the place of entry, while § 1324(a)(2) hinges on the lack of official permission to enter. Violation of § 1324(a)(1)(A) is always a felony, while violation of § 1324(a)(2) is a gross misdemeanor unless aggravating circumstances are present, including commission of the offense "for the purpose of commercial advantage or private financial gain." 8 U.S.C. § 1324(a)(2)(B)(ii).

Looking solely at the wording of the statutes, neither provision contains a requirement that the defendant specifically intend to violate United States immigration laws. Section 1324(a)(1)(A) requires only that the defendant know that the person being brought in is an alien; § 1324(a)(2) requires only that the defendant know or recklessly disregard the fact that an alien has not received official permission to enter the United States. This court has nevertheless held that "to convict a person of violating section 1324(a)(1)(A), the government must show that the defendant acted with criminal intent," *i.e.* the intent to violate United States immigration laws. *United States v. Nguyen*, 73 F.3d 887, 893 (9th Cir.1995). No court has addressed the required mens rea under the felony provisions of § 1324(a)(2)(B). Relying primarily on *Nguyen*, Barajas contends that the same intent requirement should be inferred with respect to § 1324(a)(2)(B). We agree.

*Nguyen* involved reversal of an individual's conviction under 8 U.S.C. § 1324(a)(1)(A) when he claimed that he did not intend to help bring illegal aliens into the United States. Mr. Nguyen had been employed aboard a vessel in which other crew members had clearly intended to smuggle aliens; Nguyen contended that he learned of the plan after the ship was underway, that he only helped steer the vessel in this endeavor out of fear for his personal safety, and that he tried to notify

---

**5.** The text of § 1324(a)(1)(A) provides criminal penalties for:

"Any person who—
   (i) knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien."

**6.** 8 U.S.C. § 1324(a)(2) provides criminal penalties for:
"(2) Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United states, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien...."

the Coast Guard to stop the smuggling. A jury acquitted him of conspiracy to smuggle aliens, but convicted him of the substantive count after the district court failed to instruct the jury that intent to violate immigration laws was required for conviction.

This court noted that read literally, the statute does not contain a mens rea requirement, but found that one should nevertheless be read into the statute:

> However, the statute's "silence [regarding the required mental element of the offense] by itself does not necessarily suggest that Congress intended to dispense with a conventional *mens rea* element." *Staples v. United States,* 511 U.S. 600, 605, 114 S.Ct. 1793, 1797, 128 L.Ed.2d 608 (1994); *accord United States v. United States Gypsum Co.,* 438 U.S. 422, 438, 98 S.Ct. 2864, 2874, 57 L.Ed.2d 854 (1978) ("Certainly far more than the simple omission of the appropriate phrase from the statutory definition is necessary to justify dispensing with an intent requirement."). Rather, we construe the statute in light of the fundamental principle that a person is not criminally responsible unless "an evil-meaning mind" accompanies "an evil-doing hand." *See Morissette v. United States,* 342 U.S. 246, 251, 72 S.Ct. 240, 244, 96 L.Ed. 288 (1952).
>
> . . . Accordingly, criminal offenses requiring no *mens rea* have "a generally disfavored status," *Liparota,* 471 U.S. at 426, 105 S.Ct. at 2088, and we are reluctant to conclude that Congress intended to dispense with *mens rea* as an element of a crime absent some indication of congressional intent. *E.g. Staples,* 511 U.S. at 605, 114 S.Ct. at 1797[.]

If after examining the statutory language and the legislative history we perceive any ambiguity regarding Congress's intent to require a showing of criminal intent, we will resolve the ambiguity by implying a *mens rea* element. *See Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.").

*Nguyen,* 73 F.3d at 890–91 (alteration in original). These principles apply equally to the present case.

To ascertain congressional intent, *Nguyen* examined the legislative history of 8 U.S.C. § 1324 at great length. *See id.* at 891–93. In particular, the court noted that in the early 1980s, two courts had interpreted existing law as not allowing for prosecution of individuals who brought illegal aliens into the United States and took them directly to INS officials for processing. *Id.* at 892. Congress then amended 8 U.S.C. § 1324 by passing a new section, § 1324(a)(2), creating a misdemeanor offense reaching the conduct at issue in the two prior decisions. *Id.* at 893. The *Nguyen* court's discussion of the legislative history demonstrates that Congress intended to eliminate the mens rea requirement for the misdemeanor offense in § 1324(a)(2). The *Nguyen* court, however, made a crucial distinction between the misdemeanor provision of § 1324(a)(2) and the felony provision at § 1324(a)(1)(A). The court concluded that nothing in the statute or its legislative history indicated that, with respect to the felony offense found at § 1324(a)(1)(A), Congress meant to "dispense with the *mens rea* requirement assumed to be an element of every common law offense." *Id.* at 893.

■ Similarly, nothing in the statute or legislative history indicates that Congress intended to dispense with a mens rea requirement for the felony offense of violating 8 U.S.C. § 1324(a)(2)(B). Subsection (B) adds the aggravating circumstances which elevate the offense to a felony: committing the offense (i) with reason to believe that the alien will commit a serious crime against the United States, (ii) for financial gain, or (iii) without bringing the alien immediately to an immigration officer at a designated port of entry. 8 U.S.C. § 1324(a)(2)(B)(i)-(iii). These three aggravating circumstances demonstrate the substantial overlap between the felony provisions of 8 U.S.C. § 1324(a)(2)(B) and

§ 1324(a)(1)(A). A violation of 8 U.S.C. § 1324(a)(2)(B)(iii), bringing in an alien without taking such alien to the immigration officer for inspection, is nearly identical to the conduct criminalized at 8 U.S.C. § 1324(a)(1)(A). In this case, appellant could have been charged with the felony offense of bringing in aliens under § 1324(a)(1)(A); in fact, she was charged with conspiracy to violate § 1324(a)(1)(A) rather than conspiracy to violate § 1324(a)(2)(B)(ii). The substantial overlap between the felony statutes and the serious penalties for their violation raise the concerns expressed in *Nguyen:* "Were we to conclude otherwise, we would be left with a statute that exposes persons who perform innocent acts to lengthy prison sentences." 73 F.3d at 893. Without a specific intent instruction, the jury does not have to consider whether a defendant intended to violate immigration laws, and therefore the jury could conceivably believe that they had to convict in a case like Mr. Nguyen's where the defendant conceded his involvement in performing the act of alien smuggling but had plausible claims that he nevertheless lacked the intent to violate the law. We therefore follow *Nguyen* and hold that criminal intent is required for conviction of the felony offenses of 8 U.S.C. § 1324(a)(2)(B).

■ The jury instructions given at Barajas's trial did not include an instruction on specific intent, and resulted in error.[7] This conclusion, however, does not automatically compel reversal of appellant's conviction because she failed to object to them at trial.

■ The failure to object to jury instructions requires plain error review. *Johnson v. United States,* 520 U.S. 461, 466, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997); *United States v. Keys,* 133 F.3d 1282, 1284 (9th Cir.1998) (en banc). Under this test, an appellate court considers whether there is (1) an error, (2) that is plain, and (3) which affects substantial rights. "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson,* 520 U.S. at 467, 117 S.Ct. 1544 (internal punctuation omitted). In this case, we have already concluded that there is an error. We need not reach the second or third condition, however, because the error in this case clearly does not meet the fourth condition. Barajas has not argued that she did not intend to violate the immigration laws. Furthermore, the evidence presented at trial overwhelmingly demonstrated that the alien smuggling scheme in this case was conducted in knowing violation of the immigration laws, and that appellant's involvement was substantial. Cases in which a defendant knowingly transported an alien without permission to enter into the United States, and did so for financial gain, but did not intend to violate immigration laws, would be rare. Although it did not involve the financial gain element, *Nguyen* did involve these other circumstances; this case clearly does not. We therefore conclude that the failure to provide a specific intent instruction was not plain error justifying reversal.

**B. Specific Intent Under Section 1324(a)(1)(A)(ii) & (v)(II)**

■ Barajas also contends that the jury instructions were insufficient regarding counts eight through thirteen, for violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(II), because they lacked an intent instruction. Barajas was charged as both an aider and abetter and a principal under this statute, which requires that the defendant knew that the alien was illegal and intended to further the alien's illegal presence in the United States.[8] The instruction given in

---

7. The jury was instructed that the defendant had to know or be in reckless disregard of the fact that the person being brought into the United States had not received prior official authorization to do so. This instruction, however, does not require the jury to find that a defendant intended to violate immigration laws, and is therefore insufficient.

8. The statute provides:

this case required the jury to find that "the defendant knowingly transported or moved or attempted to transport or move the alien in order to help the alien remain in the United States illegally."[9] This instruction required the jury to find criminal intent, and we therefore affirm Barajas's conviction on these counts.

## III. SUFFICIENCY OF THE EVIDENCE

■ Barajas argues that the district court erred in finding that there was sufficient evidence (1) to convict her of counts two through five and eight through thirteen of the indictment (the alien smuggling offenses), and (2) to convict her of count fourteen, violating 18 U.S.C. § 1028. In assessing the sufficiency of the evidence, "we are required to view the evidence in the light most favorable to the government and determine whether there was sufficient evidence from which a jury could rationally conclude beyond a reasonable doubt that [the defendant] was guilty of each count charged." *United States v. Esparza*, 876 F.2d 1390, 1391 (9th Cir. 1989).

### A. Alienage of Material Witnesses

■ Appellant Barajas challenges her alien smuggling convictions by arguing that the government has not presented sufficient evidence that the persons being smuggled were illegal aliens. In making this argument, Barajas relies on *United States v. Ortiz–Lopez*, 24 F.3d 53 (9th Cir. 1994), which held that no reasonable jury could find that defendant was an illegal alien when the *only* evidence offered was prior deportation orders which issued under the clear and convincing evidence standard. *Id.* at 56. The court reasoned that

the difference in burdens of proof between the two proceedings made it improper to rely on the finding at the deportation hearing in a later criminal matter. Further, allowing the jury to conclude that such evidence alone established alienage would effectively shift the burden of proof to the defendant, rather than requiring the government to prove an essential element of their case beyond a reasonable doubt. *Id.*

*Ortiz–Lopez* is clearly distinguishable from the instant case. No testimony was offered regarding prior orders of deportation of the material witnesses. Instead, the government demonstrated their alienage in a number of ways. First, the material witnesses testified to their surreptitious trips across the border. These witnesses testified to the locations of their "hometowns" in Mexico. The testimony of the precautions taken to avoid detection when crossing the border and moving through the United States, as well as of the fee involved in this transportation, also provides circumstantial evidence that the material witnesses were entering the United States illegally. Further, Agent Sheehan testified that on the night of the arrest, there were twenty-two undocumented aliens in the vehicles, and after interviews with all these individuals, six material witnesses were detained from this group. Similarly, Agent Roberts testified that the material witnesses were drawn from the group of undocumented aliens who were questioned on that night. Finally, Ms. Sampela, the sister of two of the material witnesses, testified that she knew it was a crime to help assist someone entering the United States illegally,

---

"(a) Criminal penalties

  (1)(A) any person who—

  . . .

  (ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

  . . .

  (v)(II) aids or abets the commission of any of the preceding acts, shall be punished as provided in subparagraph (B)."

**9.** The instruction given in this case regarding intent was identical to the Ninth Circuit Model Instruction. 9th Cir. Crim. Jury Instr. 9.1.4 (1997).

and that she was sorry for doing so to try to help her brothers.

Such evidence does not implicate the burden-shifting or standards of proof problems of *Ortiz–Lopez*. Instead, the circumstantial evidence in the instant case is of the sort used routinely in criminal matters. Viewing this evidence in the light most favorable to the government, a reasonable juror could certainly conclude that the material witnesses were in fact illegal aliens. We therefore affirm Barajas's convictions on this ground.

### B. Constructive Possession of Documents

■ Appellant Barajas was convicted of violating 18 U.S.C. § 1028, which makes it a crime to knowingly possess with the intent to use or transfer unlawfully five or more identification documents.[10] It is undisputed that when the government executed a search warrant on Barajas's house at 2121 Osborn Street, they found border-crossing cards, temporary residence cards, a resident alien card, a social security card, two California driver's licenses, and a California identification card; these documents were issued in several different names. Appellant Barajas does not contest that these documents were false within the terms of the statute, or that they were found in a ceramic vase in a bedroom of her house. Barajas, however, challenges the sufficiency of the evidence establishing her constructive possession of these documents.

■ To prove constructive possession, the government must establish

"a sufficient connection between the defendant and the contraband to support the inference that the defendant exercised dominion and control over the substance." *United States v. Disla*, 805 F.2d 1340, 1350 (9th Cir.1986). It is not the same as merely knowing the [contraband] is nearby. "The circumstances of each case must be examined to determine if there is 'such a nexus or relationship between the defendant and the goods that it is reasonable to treat the extent of the defendant's dominion and control as if it were actual possession.'" *United States v. Cousins*, 427 F.2d 382, 384 (9th Cir.1970) (quoting *United States v. Casalinuovo*, 350 F.2d 207, 209–11 (2nd Cir.1965)).

*United States v. Terry*, 911 F.2d 272, 278 (9th Cir.1990). When evidence is found in a residence occupied by more than one person, this court has required some additional evidence tying one or both of them to the contraband in order to establish possession. *See, e.g., Delgado v. United States*, 327 F.2d 641, 642 (9th Cir.1964) (marijuana cigarettes found in night-stand of couple does not establish whether either person alone or both together had possession, and therefore convictions of both reversed).

Our constructive possession precedents have refused to uphold convictions in the absence of some evidence tying the defendant to the particular contraband. For example, in *United States v. Reese*, 775 F.2d 1066 (9th Cir.1985), this court found the evidence insufficient to support a conviction for unlawful possession of a firearm when one gun was found "under a pillow in

---

**10.** The text of 18 U.S.C. § 1028 provides in relevant part:

"(a) Whoever, in a circumstance described in subsection (c) of this section—

. . .

(3) knowingly possesses with intent to use unlawfully or transfer unlawfully five or more identification documents (other than those issued lawfully for the use of the possessor) or false identification documents; . . . or attempts to do so, shall be punished as provided in subsection (b) of this section.

. . .

(c) The circumstance referred to in subsection (a) of this section is that—

(1) the identification document or false identification document is or appears to be issued by or under the authority of the United States or the document-making implement is designed or suited for making such an identification document or false identification document."

the largest bedroom of the house" and another was found behind a painting in the living room. *Id.* at 1073, 1074. Reese shared the house with his wife, and this court found it important that no evidence established that Mr. Reese used either the bedroom or the pillow beneath which the gun was found. *Id.* at 1074. Further, the court noted the absence of fingerprint evidence in the case. The court relied on *United States v. Chesher,* 678 F.2d 1353, 1358 (9th Cir.1982), which found that shared occupancy of a house and access to the area containing a methamphetamine lab did not by itself support a conviction for possession, but that the additional evidence of methamphetamine in the defendant's bedroom (of which he was the sole occupant) tipped the scales. *See also United States v. Valenzuela,* 596 F.2d 824, 830–831 (9th Cir.1979) (evidence that wife lived in house with husband and that she shut the door on officers attempting to enter found insufficient to support her conviction for heroin possession).

In this case, the evidence demonstrates that the documents were found in a ceramic vase on a night-stand next to a bed in a bedroom of the house shared by appellant, her boyfriend Esquivel, and their respective daughters Cynthia and Erika. The same bedroom contained appellant's purse and briefcase, as well as bills in appellant's name. No evidence, however, establishes that this bedroom was occupied only by appellant, and was not shared with Esquivel, who also received a sentence enhancement in this case for being an organizer or leader of the criminal activity involved in this case.[11] Furthermore, no evidence ties appellant directly to the documents, the

vase, or even the night-stand. In addition, there was no evidence presented that appellant actually knew the documents existed or where they were kept.[12] *Cf. Terry,* 911 F.2d at 278 (relying on evidence that defendant knew of the existence of a firearm, that he had unfettered access to it when his wife was not home, and that the firearm was found in a closet on the same shelf as numerous items of menswear to establish constructive possession of the firearm); *United States v. Frushon,* 10 F.3d 663, 664–65 (9th Cir.1993) (receipt for the gun in defendant's name and photograph of him holding the gun sufficient to tie him to the gun, when no evidence existed tying the gun to his wife even though she shared the house in which it was found). In light of *Delgado* and subsequent cases, the showing in this case is not sufficient to prove that appellant constructively possessed the documents. Appellant's conviction for possession of five or more false documents (count fourteen) is therefore reversed.

## IV. ROLE ENHANCEMENT

▪▪▪▪ Ms. Barajas received a four-level role enhancement pursuant to United States Sentencing Guideline ("U.S.S.G.") § 3B1.1(a) for being "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." A district court's finding that a defendant was an organizer or leader under U.S.S.G. § 3B1.1(a) is reviewed for clear error. *United States v. Avila,* 95 F.3d 887, 889 (9th Cir.1996). A preponderance of the evidence must show that the defendant was an organizer or leader,

---

11. At oral argument, the government argued that the bedroom in which the documents were found contained appellant's purse and briefcase, thereby linking her to the bedroom. In furnishing the court with supplemental excerpts of the record referred to in oral argument, however, the government did not provide the court with any evidence demonstrating that appellant was the *sole* occupant of the bedroom.

12. The evidence tying her to the conspiracy generally (*e.g.* the evidence of her ownership of the house and cars used, her participation in driving the cars and lifting their suspensions, etc.) does not help support her conviction for document fraud. None of these activities involve using false documents such as those found in the ceramic vase. Furthermore, the evidence at trial indicates that the alien smuggling offenses which actually occurred were accomplished without the use of false documents.

"not merely that the defendant was more culpable than others who participated in the crime." *United States v. Harper,* 33 F.3d 1143, 1150 (9th Cir.1994).

■ The criminal activity in this case clearly involved more than five participants and was otherwise extensive. In determining whether an individual was an organizer or leader of such an activity, the court should consider the following factors:

[T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, Application Note 4. The district court's lengthy findings on the issue of role enhancement demonstrate that according to these factors, appellant's role enhancement was not clearly erroneous.

The evidence demonstrated that the organization had been smuggling aliens for several years. Residents of small Mexican villages knew to call appellant's phone number to arrange for transportation to the United States. The extensive records in the case demonstrate Barajas's role in planning and organizing the criminal activity. Furthermore, the assets of the organization, including the houses and vehicles used, were primarily in Ms. Barajas's name. She drove vehicles to the rendezvous site and always returned in the car which was not carrying the illegal aliens, distancing herself from them in case the car would be stopped by the police. Considered together, this evidence establishes her extensive and dominant role in the organization.

Appellant contends that this evidence does not establish the requisite degree of control over other people necessary to support an enhancement. "[S]ome degree of control or organizational authority over *others* is required in order for section 3B1.1 to apply." *United States v. Mares–Molina,* 913 F.2d 770, 773 (9th Cir.1990) (emphasis added); *accord Harper,* 33 F.3d at 1151. Appellant's reliance on these cases, however, is misplaced. Defendant Mares only owned a trucking business which leased the warehouse where cocaine was off-loaded; the evidence showed that he knew the cocaine was there, but did not indicate any more active role in the conspiracy or connection to other conspirators. *Mares–Molina,* 913 F.2d at 773–74. The evidence linking Barajas to the other participants in the organization, and demonstrating her degree of control over the organization, is significantly stronger than the evidence in *Mares–Molina.* In *Harper,* the sentencing court relied only on defendant's special knowledge of ATM machines to impose a role enhancement for an attempted bank robbery. 33 F.3d at 1151. This court remanded the enhancement issue, directing the district court to consider all the evidence rather than relying on a bare assertion regarding special skills. *Id.* In the present case, by contrast, the district court set forth lengthy findings which detailed the evidence against Barajas. This evidence considered as a whole demonstrates that the district court's finding Barajas to be an organizer or leader was not clearly erroneous, and we therefore affirm the role enhancement.

AFFIRMED in part, REVERSED in part, and REMANDED.