UNITED STATES of America, Plaintiff–Appellee,

v.

Terrill DIXON, Defendant–Appellant.

No. 98–50601.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 2, 1999.

Filed Jan. 21, 2000.

---

1224

Sonya A. Clark, Federal Defenders of San Diego, Inc., San Diego, California, for the defendant-appellant.

Julie F. Puleo, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

Before: BRIGHT,[1] REINHARDT, and TROTT, Circuit Judges.

TROTT, Circuit Judge:

Terrill Dixon ("Dixon") appeals his jury convictions and sentence for bringing an illegal alien into the United States in violation of 8 U.S.C. § 1324(a)(2)(B)(ii), (iii). Dixon challenges his convictions on the ground that the district court erred by denying his motion to exclude in-court identification testimony, refusing his request for an in-court lineup, and improperly instructing the jury. Dixon also challenges his sentence arguing that the district court improperly enhanced his offense level pursuant to sections 3C1.2 and 2L1.1(b)(5) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and we AFFIRM in part, REVERSE in part, and REMAND to the district court.

1. The Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

# I

## Factual Background

On January 16, 1998, at approximately 11:05 p.m., a dark red Ford Escort ("Escort") driven by an African–American male entered the United States from Mexico at the San Ysidro, California port of entry. At the port of entry, Customs Inspector Sherman Lee ("Lee") questioned the driver of the Escort. According to Lee's testimony, the driver told Lee that he did not have anything to declare. In addition, the driver informed Lee that he was returning to the United States to obtain bail money for his brother, who had been arrested in Mexico. Lee then asked the driver for his license and registration. In response, the driver claimed that his license had been stolen and, in lieu of registration, the driver presented Lee with a bill of sale, explaining that he recently had purchased the car.

The driver's responses aroused Lee's suspicions and, as a result, Lee requested that the driver give him the keys so that Lee could further inspect the car. Rather than comply, however, the driver gunned the car's engine and sped away. Lee shouted for the driver to stop and yelled "port runner" to alert others that the Escort had run the port.

Officer James Coleman of the San Diego Police Department ("SDPD"), who was on duty at the San Ysidro port of entry, was positioned approximately fifty to seventy-five feet away from Lee's inspection post. Coleman testified that he heard Lee yelling "port runner," and that he observed the driver of the Escort as he sped away from the port of entry. According to Coleman, the Escort crashed through a chain link barrier and then drove northbound in the southbound lanes of Interstate–5.

Driving in the northbound lanes of Interstate–5, Coleman attempted to pursue the Escort; however, he lost sight of the car. Coleman testified that, approximately two minutes later, he heard a radio transmission reporting an automobile accident at the nearby intersection of Camino de la Plaza and Willow streets. In response, Coleman drove to the scene of the accident, where he observed the Escort. At that time, the Escort was unoccupied, the driver's door was open, and the engine was running. In addition, Coleman testified that the Escort had front-end damage that was consistent with having crashed through a chain link barrier. Once he arrived at the scene, Coleman turned off the Escort's engine and opened its hatchback, where he discovered two Mexican citizens, Francisco Alejandre–Gutierrez ("Alejandre–Gutierrez") and Ruben Nava–Moreno ("Nava–Moreno").

Although Coleman was the officer who discovered Alejandre–Gutierrez and Nava–Moreno, Border Patrol Agent Herbert Moore ("Moore"), not Coleman, was the first person to arrive at the scene of the accident. Moore, who was on duty near the San Ysidro port of entry, testified that he heard a radio transmission reporting that a dark or maroon Ford had run the border. Shortly thereafter, Moore observed a car matching that description exit the freeway the wrong way—down an on-ramp. As Moore followed the car, he radioed other border patrol agents to inform them that the car was traveling west on Camino de la Plaza. Because he was being cautious and not following closely behind, Moore briefly lost sight of the car before coming upon it stopped in the middle of the intersection at Camino de la Plaza and Willow streets, facing the wrong direction.

Moore testified that when he came upon the car, it appeared to be unoccupied, the driver's door was open, and there was a person standing directly behind the car, whom Moore described as an African–American male, approximately six feet tall, wearing a white shirt and dark shorts. At that point, Moore turned on his emergency lights and the individual started to run from the scene of the accident. Although Moore attempted to pursue the individual, he lost sight of him as the individual ran through an apartment complex. Thus, Moore radioed other border patrol agents

to inform them which direction the individual was running. As Moore continued to search the apartments, Border Patrol Agent Steven Thurman ("Thurman") approached Moore and asked him where he thought the individual might have run. According to Moore's testimony, he told Thurman that, considering the direction in which the individual ran, he probably was over by the K–Mart.

Like Moore, Thurman was on duty near the San Ysidro port of entry when he learned that a dark colored vehicle had run the border. Thurman then heard Moore's first radio transmission regarding the car's location. In response, Thurman drove to the intersection of Camino de la Plaza and Willow streets, where he observed the maroon Escort and conferred with Moore. Thurman testified that Moore told him that an individual, described as an African–American male, approximately six feet tall, wearing a white t-shirt and jeans, had fled from the scene and had run through the apartment complex.

After conferring with Moore, Thurman drove to the K–Mart shopping center in search of the individual. Shortly thereafter, Thurman spotted a person behind a Laundromat located directly across from the K–Mart. After radioing the other border patrol agents, Thurman got out of his car, pulled his weapon, and ordered the individual to the ground. The individual, whom Thurman testified was an African–American male, refused to comply with Thurman's order and fled. Thurman chased the individual over fences, through a field, and down the side of a Interstate–805 before finally apprehending him. Once Thurman apprehended the individual, who ultimately was identified as Terrill Dixon, two SDPD officers arrived at the scene. The officers questioned Dixon,

took him into custody, and brought him directly back to the San Ysidro port of entry, where the incident had begun.

At the port of entry, Lee and Moore identified Dixon as the driver of the Escort who had run the border earlier that evening. Lee testified that he was in the security office filling out a report when he heard someone say "We caught him." Lee then turned around, saw Dixon in handcuffs, and identified him as the port runner. Moore testified that he observed Dixon in a holding cell, along with others who were being detained. Moore then identified Dixon as the individual who was standing behind the car at the intersection of Camino de la Plaza and Willow streets. Finally, Thurman testified that there was not a "technical" identification procedure conducted back at the port of entry. Instead, Thurman explained, there was "just a consensus that [Dixon] was the guy."

## II

### Procedural Background

Dixon was charged with two violations of 8 U.S.C. § 1324(a)(2)(B)(ii) [2] and two violations of 8 U.S.C. § 1324(a)(2)(B)(iii) [3] for bringing an illegal alien into the United States. Prior to trial, Dixon's counsel made a motion to exclude any in-court identification of her client, or, in the alternative, for an in-court lineup, arguing that such a lineup was necessary because no formal identification procedure had ever been conducted and that any in-court identification of the defendant might itself be unduly suggestive.

In the event that the motion for an in-court lineup was denied, counsel urged that "any purported identification witnesses should be examined outside the

---

**2.** Section 1324(a)(2)(B)(ii) provides certain criminal penalties for anyone who brings or attempts to bring an illegal alien into the country "for the purpose of commercial advantage or private financial gain." 8 U.S.C. § 1324(a)(2)(B)(ii) (1999).

**3.** Section 1324(a)(2)(B)(iii) provides certain criminal penalties for anyone who brings or attempts to bring an illegal alien into the country if "the alien is not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry." 8 U.S.C. § 1324(a)(2)(B)(iii) (1999).

presence of the jury and outside the presence of Mr. Dixon" to see if the witness had "an adequate independent recollection." This nonspecific request for an examination of the witness did not name any witness, nor did it give any cognizable reason for the requested examination other than that no witness had ever seen Mr. Dixon in a lineup. Counsel's motion and supporting statements of facts and supporting memorandum contained no allegations of impermissibly suggestive pretrial identification procedures, nor was the motion supported by any declarations or affidavits. The motion dismissed as "impractical" any alternative protective procedure, such as having the defendant sit somewhere in the courtroom other than the defense table. At the motions hearing conducted in open court immediately before the trial, the only factor counsel added on behalf of her motion was that "it's very easy for a witness to take the stand and just point to defense table to point out the defendant." The district court denied Dixon's motion and set the trial date for March 31, 1998.

At trial, Alejandre–Gutierrez and Nava–Moreno, neither of whom had documents to enter the United States legally, testified for the government. They explained that they each independently had made arrangements with some men in Tijuana, Mexico to help them enter the United States. These men promised to get Alejandre–Gutierrez and Nava–Moreno across the border in exchange for future payment. According to Alejandre–Gutierrez and Nava–Moreno, these men placed both of them in the back of a small red car in Tijuana. Alejandre–Gutierrez and Nava–Moreno testified, however, that neither of them ever saw the driver of the car.

Although neither Alejandre–Gutierrez nor Nava–Moreno could identify Dixon as the driver of the Escort, Lee testified on behalf of the government and positively identified Dixon as the port runner he saw on January 16, 1998. Coleman, Moore, and Thurman testified that the defendant "matched the description" of the person about whom they testified.[4]

At the close of testimony, Dixon submitted proposed jury instructions to the district court. In particular, Dixon requested that the court give an instruction addressing the "commercial advantage or private financial gain" element of 8 U.S.C. § 1324(a)(2)(B)(ii) in great detail. The court, however, refused to give Dixon's proposed instruction, opting instead to give instructions based largely on the Ninth Circuit Model Jury Instructions. After hearing the instructions and then deliberating for a short time, the jury returned guilty verdicts on all counts.

On September 8, 1998, the district court sentenced Dixon. At the sentencing hearing, the government presented Dixon's pre-sentence report ("PSR"). The PSR indicated that, under U.S.S.G. § 2L1.1, entitled "Smuggling, Transporting, or Harboring an Unlawful Alien," Dixon's base offense level was twelve. However, pursuant to U.S.S.G. § 2L1.1(b)(5), a specific offense characteristic, Dixon's base offense level was increased to eighteen. Section 2L1.1(b)(5) provides:

> If the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person, increase by 2 levels, but if the resulting offense level is less than level 18, increase to level 18.

U.S.S.G. § 2L1.1(b)(5) (1997). According to the PSR, section 2L1.1(b)(5) applied in this case because Dixon concealed Alejandre–Gutierrez and Nava–Moreno in the trunk of a vehicle, where the aliens were without adequate oxygen and were unable to extricate themselves. Thus, in the probation officer's view, the offense involved

---

4. The prosecutor apparently believed that "matching the description" of a person is the equivalent of "is" the person. We respectfully suggest that this is incorrect. Many people can match the description of another person without being that person. However, Lee's identification testimony of the defendant did not suffer from this defect, and counsel for the defendant raised no objection to the prosecutor's characterization in final argument of Coleman's, Moore's, and Thurman's testimony as having identified the defendant.

the intentional or reckless creation of a substantial risk of death or serious bodily injury to another person.

In addition, the PSR recommended that the district court adjust Dixon's offense level upward pursuant to section 3C1.2 of the Guidelines. Section 3C1.2, entitled "Reckless Endangerment During Flight," instructs the court to impose a two-level enhancement "if the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S.S.G. § 3C1.2 (1997). The PSR stated that such an adjustment was appropriate because Dixon, inter alia, drove northbound in the southbound lanes of Interstate–5, thereby displaying a total disregard for the safety of the passengers and the motoring public.

Dixon challenged the PSR's recommendations regarding sections 2L1.1(b)(5) and 3C1.2 of the Guidelines. First, Dixon argued that U.S.S.G. § 2L1.1(b)(5) did not apply because Alejandre–Gutierrez and Nava–Moreno in fact were concealed in the car's hatchback, not its trunk as stated by the PSR. As such, Dixon explained, the aliens were neither deprived of oxygen nor unable to extricate themselves and, therefore, there was not a substantial risk of death or serious bodily injury. Second, Dixon challenged the section 3C1.2 enhancement contending that such an adjustment could not be imposed concurrently with a section 2L1.1(b)(5) adjustment.

The district court rejected Dixon's arguments and agreed with the PSR's recommendations. Specifically, the court responded "I think so too" to the government's statement that it thought that the Probation Department's recommendation was correct. Thus, the court determined that Dixon's offense level was twenty, which yielded a guideline range between fifty-one and sixty-three months. Accordingly, the court sentenced Dixon to a prison term of sixty months on each count, to run concurrently, with three years of supervised release. Dixon appeals.

## III

### Discussion

#### A. In–Court Identification Testimony

 We review a district court's decision to admit in-court identification testimony for an abuse of discretion. *United States v. Carbajal,* 956 F.2d 924, 929 (9th Cir.1992). Likewise, a district court's denial of a request for an in-court lineup is reviewed for an abuse of discretion. *United States v. Domina,* 784 F.2d 1361, 1369 (9th Cir.1986).

In *United States v. Burdeau,* 168 F.3d 352 (9th Cir.1999), we reiterated the rule that " '[t]here is no constitutional entitlement to an in-court line-up or other particular method of lessening the suggestiveness of an in-court identification....' " *Id.* at 358 (quoting *Domina,* 784 F.2d at 1369). Citing *United States v. Lumitap,* 111 F.3d 81, 85 n. 4 (9th Cir.1997), we did point out that " '[a]s long as the witness has an independent recollection that is wholly untainted by the police misconduct, an in-court identification is permissible.' " *Burdeau,* 168 F.3d at 358. The concern discussed in *Burdeau* about unreliable eyewitness identification testimony, of course, is not limited to allegations of taint arising out of police misconduct. Such troubles could arise from other origins.

 In the case at bar, however, the motion did not suggest the existence of any problem resulting from any prior identification. No allegation of either police misconduct or other source of contaminated identification was brought to the attention of the district court in connection with the motion to exclude and/or for an in-court lineup. Under these circumstances, the court was not presented with any specified need to examine the witnesses to see if they had an adequate independent recollection. The motion did not state that there were any prior identifications or that the subsequent in-court identifications might be tainted thereby. If a district court is not advised of a source that might

**1230**

taint a witness's identification of a defendant, there is no obligation to examine that witness to see if the nonexistent source adversely affected the witness's testimony. Thus, we are guided by the Supreme Court's admonition that the "proper evaluation of [identification] evidence under the instructions of the trial judge is the very task our system must assume juries can perform." *Watkins v. Sowders,* 449 U.S. 341, 347, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981).

Accordingly, we conclude on this deficient showing that the district court did not abuse its discretion in (1) denying the motion to exclude the identification testimony of the officers, (2) denying the request for an in-court lineup, and (3) rejecting the request to examine the witnesses outside the presence of the jury.

## B. Jury Instructions

▮ In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation. *United States v. Marin–Cuevas,* 147 F.3d 889, 893 (9th Cir.1998). A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. *United States v. Harrison,* 34 F.3d 886, 889 (9th Cir.1994). The standard of review that we apply when the district court denies a proposed jury instruction turns on the nature of the error alleged. *United States v. Knapp,* 120 F.3d 928, 930 (9th Cir.1997). We review the question whether the district court's instructions adequately pre-

sented the defendant's theory of the case de novo. *Id.* If the district court's instructions fairly and adequately covered the elements of the offense, however, we review the instruction's "precise formulation" for an abuse of discretion. *Id.*

In this case, Dixon argues that we should reverse his convictions because the district court erred in instructing the jury. Specifically, Dixon contends that the court erred by: (1) refusing to give certain instructions, which Dixon refers to as "theory of the defense" instructions; and (2) instructing the jury that it could consider evidence of the defendant's flight as indicative of guilt. Dixon's argument is without merit.

Dixon challenges the district court's refusal to give the jury his "theory of the defense" instructions. Dixon argues that by failing to give his first "theory of the defense" instruction [5] (the "Knowingly Instruction"), the court misstated the law, thereby committing reversible error. The government argues, on the other hand, that the court did not err in refusing to give the Knowingly Instruction because Dixon had objected to a similar instruction proposed by the government. After reviewing the record, however, we were surprised to discover that the district court in fact gave the Knowingly Instruction word-for-word and, therefore, we reject Dixon's argument.

▮ Dixon also argues that the district court erred by refusing to give his second "theory of the defense" instruction [6] (the "Commercial Advantage Instruction"),

**5.** Dixon's first "theory of the defense" instruction provided:

An act is done "knowingly" if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

The purpose of adding the word "knowingly" is to insure [sic] that no one will be convicted for an act done because of mistake, or accident, or other innocent reason.

With respect to an offense such as charged in this case, specific intent must be proved beyond a reasonable doubt before there can be a conviction.

**6.** Dixon's second "theory of the defense instruction" provides:

The government has the burden of proving all the elements of the crime charged, including the elements that the defendant committed the offense for "commercial advantage" or "private financial gain."

First, the government must prove to you beyond a reasonable doubt that the defendant not only committed the offense of bringing in an alien into the United States, the government must also prove beyond a reasonable doubt that the defendant committed the act

which addressed in detail the "commercial advantage or private financial gain" element of 8 U.S.C. § 1324(a)(2)(B)(ii). Rather than giving Dixon's proposed instruction, the court instructed the jury, in relevant part, that: (1) the government has the burden to prove every element of the charges beyond a reasonable doubt; (2) if the government does not prove every element beyond a reasonable doubt, the jury must find the defendant not guilty; and (3) with regard to 8 U.S.C. § 1324(a)(2)(B)(ii), the government has the burden of proving that the defendant acted for the purpose of commercial advantage or private financial gain.

In Dixon's view, the court's instruction was insufficient because it did not adequately cover his theory of the defense, which was that the government had failed to prove beyond a reasonable doubt that Dixon brought an illegal alien into the United States "for the purpose of commercial advantage or private financial gain." In particular, Dixon points out that, unlike the Commercial Advantage Instruction, the court's instruction failed to define the terms "commercial advantage" and "private financial gain." As such, Dixon contends, the jury was forced to make unguided decisions with respect to evidence of financial arrangements made by Alejandre–Gutierrez and Nava–Moreno before they were smuggled into the United States.

■ After reviewing the record, we hold that the district court did not err in refusing to give the Commercial Advantage Instruction. We have held that it is "reversible error to refuse a charge on a defense theory for which there is an evidentiary foundation and which, if believed by the jury, would be legally sufficient to render the accused innocent." *United States v. Faust*, 850 F.2d 575, 583 (9th Cir.1988). However, a defendant is not entitled to any particular form of an instruction, so long as the instructions given fairly and adequately cover his theories of defense. *Id.*

In this case, the court fairly and adequately instructed the jury regarding Dixon's theory of the defense. As noted above, the court clearly instructed the jury that in order to find Dixon guilty of violating 8 U.S.C. § 1324(a)(2)(B)(ii), the government had to prove beyond a reasonable doubt that Dixon "acted for the purpose of commercial advantage or private financial gain." This instruction satisfied the requirement that a defendant must be shown to have acted with criminal intent to be guilty of this charge. *See United States v. Barajas–Montiel*, 185 F.3d 947 (9th Cir. 1999). Moreover, the court did not err by failing to define "commercial advantage" and "private financial gain" because these are common terms, whose meanings are within the comprehension of the average juror.[7] *See United States v. Aguilar*, 80

---

for "commercial advantage" or "private financial gain."

If the prosecution fails to convince you beyond a reasonable doubt that the defendant committed the offense for "commercial advantage" or "private financial gain" then you must acquit the defendant of the charge alleging that Mr. Dixon brought in an illegal alien for "commercial advantage" or "private financial gain."

Secondly, the terms "commercial advantage" and "private financial gain" do not mean any kind of economic gain. In order to prove "commercial gain," the government must prove beyond a reasonable doubt that the defendant (1) knowingly brought an alien into the United States and (2) had a commercial business or enterprise and (3) that enterprise or business gained as a result of the offense. If these factors are not proven be-

yond a reasonable doubt, you must acquit Mr. Dixon.

In order to prove "private financial gain" the government must prove beyond a reasonable doubt that the defendant received financial gain.

7. The issue in this case was not (1) whether a particular form of consideration constituted a "commercial advantage" or "private financial gain," or (2) whether a person who received no consideration but who acted with the requisite knowledge and intent as an aider and abetter or co-conspirator could be convicted under this statute. The issue here rather is simply whether the government met its burden of proof as explained to the jury. There was no doubt that money was paid in connection with this transaction. The question as

F.3d 329, 331 (9th Cir.1996) (stating that the district court is not necessarily required to define "knowledge" because it is a common word that an average juror can understand); *Walker v. Endell,* 850 F.2d 470, 475 (9th Cir.1987) (affirming an Alaska Court of Appeals' decision, which held that the failure to define the term "recklessly" was not erroneous because "the average juror's common sense of the meaning would suffice"). Accordingly, we reject Dixon's argument and hold that the district court acted within its discretion in refusing to give the Commercial Advantage Instruction.

■ Finally, Dixon contends that the district court erred by instructing the jury that it could consider evidence of the defendant's flight as indicative of guilt.[8] In support of this argument, Dixon points out that the Committee on Model Criminal Jury Instructions ("Committee") recommends against giving instructions dealing with flight. *See* Committee on Model Criminal Jury Instructions, *Ninth Circuit Manual of Model Jury Instructions: Criminal* 55 (1997). While it is true that the Committee generally discourages courts from giving instructions regarding flight, we have held that flight instructions are valid if the evidence supports "a chain of unbroken inferences from the defendant's behavior to the defendant's guilt of the crime charged." *United States v. Silverman,* 861 F.2d 571, 581 (9th Cir.1988). To satisfy this requirement, four inferences must be justified: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt

concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged. *Id.*

■ Because evidence of flight can be consistent with innocence, we must evaluate flight instructions by looking for facts that support the inference from flight to a consciousness of guilt of the specific crime charged. *Id.* For example, we consider whether the defendant knew the police suspected him of a particular crime. *See United States v. Tille,* 729 F.2d 615, 622 (9th Cir.1984) (upholding flight instruction where local newspaper had reported progress of police investigation and defendant had been carrying name and address of criminal defense attorney when arrested); *United States v. Hernandez–Miranda,* 601 F.2d 1104, 1107 (9th Cir.1979) (upholding flight instruction where defendant had been arraigned and had pled guilty prior to fleeing and, therefore, knew about the charges against him). We also consider whether the defendant fled immediately after the crime. *Silverman,* 861 F.2d at 571.

■ We hold that the district court in this case did not err in instructing the jury that defendant's flight could be interpreted as consciousness of guilt. The facts support the inference that defendant's flight indicates a consciousness of guilt of the specific crime charged. First, Dixon knew that the Border Patrol suspected that he was attempting to smuggle something into the United States because Inspector Lee had asked Dixon for his car keys so that Lee could further inspect the car. Second,

---

put to the jury was whether Dixon received, or was to receive, any of it.

8. The district court instructed the jury as follows:

The evidence that defendant immediately fled after having been accused of committing a crime in the United States if the circumstances, if proven, can be considered by the jury as showing consciousness of guilt on the part of the defendant.

In your evaluation of this evidence of flight, you may consider that there may be reasons

fully consistent with innocence that could cause a person to flee. Fear of law enforcement, a reluctance to become involved in an investigation may cause a person who has committed no crime to immediately flee himself. Whether or not evidence of flight on the part of the defendant causes the jury to find a consciousness of guilt on his part, and the significance of any of the consciousness of guilt is entirely up to you as the sole judges of the facts of the case.

Dixon fled immediately after Lee asked to search his car. Dixon's actions, therefore, support an inference that links his flight from the port of entry with his guilt. In addition, the district court clearly instructed the jury that evidence of defendant's flight is not necessarily indicative of guilt and that there could be innocent explanations for the defendant's flight. Moreover, the court emphasized that the jury alone must make the decision as to what inferences to draw from the defendant's flight.

Accordingly, we hold that the district court acted appropriately in (1) refusing to give Dixon's "theory of the defense" instructions, and (2) instructing the jury that it could consider evidence of flight as indicative of guilt.

### C. Sentencing

■ We review the district court's interpretation of the Guidelines de novo. *United States v. Smith*, 175 F.3d 1147, 1149 (9th Cir.1999). The district court's factual findings in the sentencing phase, however, are reviewed for clear error. *United States v. Castaneda*, 94 F.3d 592, 594 (9th Cir.1996).

Here, the district court adopted the PSR's recommendation to increase Dixon's offense level from twelve to twenty, pursuant to sections 2L1.1(b)(5) and 3C1.2 of the Guidelines. On appeal, Dixon argues that the district court erred in increasing his offense level because: (1) section 2L1.1(b)(5) did not apply to the facts of this case; and (2) a section 3C1.2 enhancement cannot be imposed concurrently with a section 2L1.1(b)(5) adjustment. Although we reject the argument regarding section 3C1.2, we agree with Dixon that the district court improperly increased his offense level pursuant to section 2L1.1(b)(5).

### 1. *U.S.S.G. § 2L1.1(b)(5)*

Section 2L1.1(b)(5) instructs the district court to increase a defendant's offense level "[i]f the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another

person...." U.S.S.G. § 2L1.1(b)(5). Furthermore, the Guidelines provide that reckless conduct to which the adjustment from section 2L1.1(b)(5) applies includes a wide variety of conduct, such as transporting persons in the trunk or engine compartment of a motor vehicle. U.S.S.G. § 2L1.1(b)(5), app. note 6. In this case, the PSR found that Dixon had transported Alejandre–Gutierrez and Nava–Moreno in the "trunk" of his vehicle, where they were without adequate oxygen and were unable to extricate themselves. The district court adopted the PSR's findings and increased Dixon's offense level under U.S.S.G. § 2L1.1(b)(5).

■ After reviewing the record, we hold that these findings by the district court are clearly erroneous. The PSR repeatedly stated that Alejandre–Gutierrez and Nava–Moreno were in the "trunk" of Dixon's car. In actuality, however, the aliens were transported in the hatchback area of the vehicle, which was evidenced by the pictures of the vehicle that Dixon presented to the district court. Although a hatchback area may serve the same purpose as a trunk (i.e., storage), a hatchback area and a trunk are, in fact, very different. Unlike a trunk, except for the lack of seat belts, the dangers of riding in the hatchback area of a car are not obvious. For example, a person hiding inside a locked trunk could not extricate himself, while a person hiding in a hatchback area easily could extricate himself by pushing up the lightweight, flimsy hatchback cover. Hence, the district court's findings that Alejandre–Gutierrez and Nava–Moreno were without adequate oxygen and were unable to extricate themselves from the hatchback area of the vehicle needed evidentiary support. After reviewing the record, however, we find that there was no evidence that: (1) the hatchback area was airtight, thereby depriving Alejandre–Gutierrez and Nava–Moreno of adequate oxygen; or (2) the aliens were unable to extricate themselves.

Because of this lack of evidence, we hold that the district court erred in increasing Dixon's offense level pursuant to U.S.S.G. § 2L1.1(b)(5). Accordingly, we reverse and remand for resentencing without the six-level increase in the offense level which had been imposed under U.S.S.G. § 2L1.1(b)(5).

### 2. *U.S.S.G. § 3C1.2*

 Dixon also argues that the district court erred by increasing his offense level pursuant to U.S.S.G. § 3C1.2, which provides for a two-level enhancement "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer.…" U.S.S.G. § 3C1.2. Specifically, Dixon contends that the section 3C1.2 enhancement was inappropriate because the Guidelines prohibit a sentencing court from imposing section 2L1.1(b)(5) and section 3C1.2 enhancements concurrently, if they are based on the same conduct. *See* U.S.S.G. § 2L1.1, app. note 6; *id.* § 3C1.2, app. note 1. Although this is true, we reject Dixon's argument because the district court's imposition of section 2L1.1(b)(5) and section 3C1.2 enhancements was not based on the same conduct. In short, even if we had not determined that the enhancement based on section 2L1.1(b)(5) must be stricken, we would affirm the section 3C1.2 enhancement.

As discussed above, the district court increased Dixon's offense level under U.S.S.G. § 2L1.1(b)(5) because it found that Dixon had concealed Alejandre–Gutierrez and Nava–Moreno in the trunk of a vehicle, where they were without adequate oxygen and were unable to extricate themselves. On the other hand, the court enhanced Dixon's offense level pursuant to section 3C1.2 because it found that when Dixon fled from law enforcement, he drove northbound in the southbound lanes of Interstate–5, thereby creating a substantial risk of death or serious bodily injury to the passengers and the motoring public. Because the enhancements under sections 2L1.1(b)(5) and 3C1.2 were not based on the same conduct, we conclude that the court properly adjusted Dixon's offense level upward two levels pursuant to U.S.S.G. § 3C1.2.

### IV

### CONCLUSION

We hold that the district court properly denied Dixon's motion to exclude the in-court identification testimony and the request for an in-court lineup, and the court properly instructed the jury, and we AFFIRM the conviction. However, we hold that the district court erred in enhancing Dixon's offense level pursuant to U.S.S.G. § 2L1.1(b)(5). Therefore, we REVERSE and REMAND for recalculation and reduction of Dixon's sentence by excluding the six-level increase in the offense level which had been included in his offense level in sentencing him to sixty months overall in prison.

AFFIRMED in part; REVERSED and REMANDED in part.