**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

CARLOS TORRES-FLORES,
  *Defendant-Appellant.*

No. 05-50898

D.C. No.
CR-05-00620-BTM

OPINION

Appeal from the United States District Court
for the Southern District of California
Barry T. Moskowitz, District Judge, Presiding

Argued and Submitted
December 5, 2006—Pasadena, California

Filed September 4, 2007

Before: Stephen Reinhardt, Alex Kozinski and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Kozinski;
Partial Concurrence and Partial Dissent by Judge Ikuta

11441

**COUNSEL**

Matthew C. Shaftel and Vincent J. Brunkow, Federal Defenders of San Diego, Inc., San Diego, California, for the defendant-appellant.

Carol C. Lam, United States Attorney for the Southern District of California, San Diego, California; Roger W. Haines, Jr., Assistant United States Attorney, San Diego, California; Christopher P. Tenorio, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

## OPINION

KOZINSKI, Circuit Judge:

We address whether the district court erred in refusing to give a lesser-included-offense instruction to the jury, and whether defendant was eligible for a sentencing enhancement pursuant to U.S.S.G. § 2L1.1(b)(5) (2005)[1] for transporting an alien in a manner creating a "substantial risk of death or serious bodily injury."

## Facts

Carlos Torres-Flores drove up to the San Ysidro Port of Entry in an extended-cab pickup on March 23, 2005. Although he told the border inspector he had nothing to declare, the inspector became suspicious and proceeded to investigate. When the inspector opened the driver's side door, he saw a "big hump" in the carpet behind the back seat. That "hump" turned out to be Fortino Marquez-Cruz, an alien who lacked authorization to enter the United States. Defendant was arrested and charged with bringing an unauthorized alien to the United States without presenting him for inspection at the port of entry, in violation of 8 U.S.C. § 1324(a)(2)(B)(iii). He was convicted and sentenced to 30 months imprisonment.

On appeal, defendant challenges the district court's decision not to give a lesser-included-offense instruction and its decision, at sentencing, that defendant was eligible for an enhancement pursuant to U.S.S.G. § 2L1.1(b)(5) (2005).[2]

---

[1]This provision is currently codified at U.S.S.G. § 2L1.1(b)(6) (2006).

[2]Defendant also claims that the district court erred in refusing to give an instruction on derivative citizenship. Because the record contains less than a scintilla of evidence that Marquez-Cruz was a derivative citizen, we cannot conclude that the district court abused its discretion in refusing to give the proffered instruction. *United States* v. *Wofford*, 122 F.3d 787, 789 (9th Cir. 1997).

**Analysis**

**[1] 1.** Section 1324(a)(2) makes it both a felony and a misdemeanor to knowingly or recklessly bring to the United States "an alien [who] has not received prior official authorization to come to, enter, or reside in the United States." Whether the crime is a misdemeanor, punishable by no more than one year imprisonment, or a felony, punishable by up to 15 years imprisonment, depends on the existence of certain aggravating factors laid out in subsections 1324(a)(2)(B)(i)-(iii). In addition to the elements specifically listed in the statutory text, we have held that the felony offense contains an implied specific intent element, namely that defendant have acted with intent to "violate immigration laws." *United States* v. *Barajas-Montiel*, 185 F.3d 947, 952-53 (9th Cir. 1999); *see also United States* v. *Nguyen*, 73 F.3d 887, 894 n.4 (9th Cir. 1995) (noting that when criminal intent is an implied element of a crime it "is no less an element of the offense here than if it had been expressly provided for in the statute").

**[2]** Defendant claims that the district judge erred in refusing to instruct the jury that it could find defendant guilty of a misdemeanor offense under section 1324(a)(2)(A) while acquitting him of a felony offense under section 1324(a)(2)(B). A defendant is entitled to a lesser-included instruction if he shows that: 1) "the offense on which instruction is sought is a lesser-included offense of that charged" and 2) that the "jury rationally could conclude that the defendant was guilty of the lesser-included offense but not of the greater." *United States* v. *Pedroni*, 958 F.2d 262, 267-68 (9th Cir. 1992).[3] Everyone agrees that the misdemeanor offense here

---

[3]We have yet to resolve whether a defendant's right to a lesser-included instruction in a noncapital case springs solely from Fed. R. Crim. P. 31(c) or also from the Fifth Amendment Due Process Clause. *Compare Keeble* v. *United States*, 412 U.S. 205, 208 (1973) (noting the federal common law and Rule 31(c) provide a right to such instruction), *with Beck* v. *Ala-*

contains all of the elements of the felony, minus the specific intent requirement and the aggravating factors, and is therefore a lesser included within the greater felony offense. The parties dispute whether the district court abused its discretion in concluding that a rational jury could not have convicted defendant of the lesser offense while acquitting as to the greater. *See United States* v. *Naghani*, 361 F.3d 1255, 1262 (9th Cir. 2004) (after we've determined that the charged offense contains all the elements of a lesser offense, we review the decision not to give a lesser-included instruction for abuse of discretion).

On this record, a rational jury could not have doubted that the statutory aggravating factor referenced in the indictment was present—that the alien was "not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry." *See* 8 U.S.C. § 1324(a)(2)(B)(iii). The primary inspector at the port of entry, Agent Gibbs, testified that defendant failed to present Marquez-Cruz for inspection, an account backed up by the referral slip Gibbs filled out before sending defendant to secondary. Although defendant attacked the credibility of the agent on other grounds, defendant never contested that Marquez-Cruz was not presented to the agent for inspection.

---

*bama*, 447 U.S. 625 (1980) (holding that a defendant in a capital case has a due process right to a lesser-included instruction when the facts would allow the jury to impose a life sentence rather than death). *Beck* left open whether the due process right extends to defendants in noncapital cases. 447 U.S. at 638 n.14 ("We need not and do not decide whether the Due Process Clause would require the giving of such instructions in a noncapital case."). While defendant here asserts a right under both provisions, we also need not resolve the issue, because, to the extent the Due Process Clause affords defendants greater protections than Rule 31(c), it would not affect the outcome of this case. The due process right recognized in *Beck* applies only "when the evidence would have supported" conviction of the lesser offense but acquittal of the greater. 447 U.S. at 627 (internal quotation marks omitted). For the reasons we explain below, such is not the case here. *See* pages 11448-50 *infra*.

When proposed instructions were being discussed, counsel for defense did not object to the district judge's observation that "there is no dispute" as to this element. And, in closing argument, defense counsel conceded that Agent Gibbs "found" Marquez-Cruz behind the back seat. Indeed, any assertion that defendant had presented the alien for inspection would have contradicted Torres-Flores' entire defense—that he was a "blind mule" who drove to the port of entry unaware that Marquez-Cruz was hiding behind his back seat.

**[3]** The only real question is whether the jury could have convicted defendant of the misdemeanor without also finding that he acted with the intent that would convert the crime into a felony. *Barajas-Montiel* defined the implicit intent element in a section 1324(a)(2)(B) offense as a specific intent "to violate immigration laws." 185 F.3d at 953. In applying this requirement, we have held that the government need not prove that defendant intended to violate Title 8 of the U.S. Code.[4] In a later smuggling case, *United States* v. *You*, 382 F.3d 958 (9th Cir. 2004), we held that acting with "*the purpose of* avoiding [the aliens'] detection by immigration authorities" is "synonymous with having acted with necessary *intent* as required in *Barajas-Montiel*." *Id.* at 966 (alterations in original) (internal quotation marks omitted).

**[4]** In order to convict defendant of either the misdemeanor or the felony, the jury had to find that defendant "knowingly" brought Marquez-Cruz to the United States—in other words, that he was aware of Marquez-Cruz's presence in the vehicle.[5]

---

[4]Such an element would be a rare novelty in our legal system. Just as "ignorance of the law or a mistake of law is no defense to criminal prosecution," *Cheek* v. *United States*, 498 U.S. 192, 199 (1991), knowledge of the law is almost never an element of a crime.

[5]The jury was specifically instructed that it could convict only if it found that defendant "*knowingly* brought Fortino Marquez-Cruz to the United States." Although the text of the statute does not contain an express mens rea element that applies to the act of "bringing" an alien to the

As already noted, there was no dispute that defendant did not present Marquez-Cruz for inspection. According to *You*, this is tantamount to an intent to violate the immigration laws. Torres-Flores argues, however, that he may have had a different motive for failing to present Marquez-Cruz for inspection, namely that Marquez-Cruz may have wanted to avoid confronting law enforcement officers for a non-immigration-related reason, such as a fear that he would be found to have violated probation. There is no support in the record for any such finding. In any event, that Marquez-Cruz may have had a non-immigration-related reason for wishing to avoid detection does not change the fact that Torres-Flores knowingly hid him from immigration authorities and thus (according to *You*) acted with the intent to violate the immigration laws. Regardless of defendant's subjective reasons for failing to present Marquez-Cruz for inspection, a rational jury could not have found that defendant lacked the requisite intent while also finding that he knowingly helped Marquez-Cruz evade detection by immigration authorities. The district court therefore did not abuse its discretion in denying the lesser-included-offense instruction.

**2.** Defendant also challenges the district court's determination that the offense involved "a substantial risk of death or serious bodily injury to another person," a determination that resulted in a 6-level increase in his offense level and more than doubled the applicable Guidelines range from 12-18 months to 30-37 months. *See* U.S.S.G. § 2L1.1(b)(5) (2005).

United States, we've recognized that section 1324(a)(2) "provides for criminal penalties for any person who *knowingly* brings an 'unauthorized' alien into the United States." *Gete* v. *I.N.S.*, 121 F.3d 1285, 1288 n.2 (9th Cir. 1997) (emphasis added). To construe the prefatory clause of section 1324(a)(2) otherwise would render the misdemeanor a strict liability crime, a species of offense that is heavily disfavored in our legal system. *See Dennis* v. *United States*, 341 U.S. 494, 500 (1951) ("The existence of a mens rea is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence.").

The extended-cab pickup truck defendant was driving had been modified to create additional space for a passenger to hide behind the back seat. Border agents discovered the alien passenger, Marquez-Cruz, hiding in this makeshift compartment.

**[5]** We start with the observation that, although vehicular travel is generally quite safe, it is not risk-free. Every passenger traveling on our highways faces a small, but non-trivial, risk of death or injury.[6] This baseline risk is inherent in all vehicular travel and must therefore be disregarded in determining whether the offense was committed in a manner that involved a "substantial risk of death or serious bodily injury to another person." We focus on the ways in which the method of transporting the alien increased the risk of death or injury beyond that faced by a normal passenger traveling on our streets and highways. The risk could be increased in a number of ways: (1) The driver could increase the likelihood of an accident by taking a dangerous route (e.g., off-road) or driving in a dangerous manner (e.g., recklessly or drunk); (2) the method of transportation could increase the likelihood of an accident (e.g., a severely overloaded vehicle); (3) the method of transportation could increase the risk of an injury even in the absence of an accident (e.g., passengers transported with insufficient ventilation or subject to injury from moving mechanical parts); or (4) the method of transportation could increase the risk that an accident, if it should occur, would cause injury or death (e.g., passengers transported in a manner that makes them more likely to be injured by crumpled metal or shattered glass than if they had been seated normally).

**[6]** The district court found an increase in only the last of

---

[6]Fifteen of every 100,000 Americans died in a car crash in 2005; 911 more were injured. Nat'l Highway Traffic Safety Admin., *Traffic Safety Facts 2005* verso (2006), *available at* http://www-nrd.nhtsa.dot.gov/Pubs/TSF2005.pdf.

those four risks, namely, that *if* an accident occurred, Marquez-Cruz was more likely to be hurt. The district court didn't find that defendant's conduct increased the likelihood of an accident; and the court specifically found that Marquez-Cruz's placement didn't increase the risk of injury absent an accident: "If there's no collision, there's no problem."[7] We must therefore decide whether the increased risk of injury in case of an accident was significant enough to merit a 6-level enhancement in the offense level.

In making this determination, we accord "considerable weight" to the Guidelines' application notes, *United States* v. *Fine*, 975 F.2d 596, 599 n.4 (9th Cir. 1992) (en banc), which provide examples that give some indication of what kinds of risks substantially increase a concealed passenger's chances of injury or death over and above the normal danger of vehicular travel. What is notable about these examples— "transporting persons in the trunk or engine compartment of a motor vehicle, carrying substantially more passengers than the rated capacity of a motor vehicle"—is that in each, unlike here, the means of travel either exacerbates the *likelihood* of an accident, subjects the passenger to a risk of injury even during an accident-free ride, or both.[8]

---

[7]The dissent suggests that the district court found that Marquez-Cruz was subject to injury even in the absence of an accident because of the compartment's sharp metal edges, *see* Dissent at 11454, 11461, but this contradicts the district court's findings quoted in the text. Moreover, the district court's discussion makes clear that it was concerned only with the dangers Marquez-Cruz would have faced if defendant had crashed the truck: "[I]f there's a collision . . . what's going to happen? . . . Metal bends. Things happen. Fires occur. Explosions occur. And this person . . . can't get out . . . ."

[8]Riding in the trunk exposes the passenger to the risk of suffocation or heat stroke. *See* U.S. Dep't of Transp., *Motor Vehicle Trunk Entrapment Report to Congress* (2000), *available at* http://www.nhtsa.dot.gov/cars/problems/studies/Trunk/#ter3 ("The combination of high temperature, humidity, and poor ventilation all contribute to the extreme danger of car trunks."). Passengers stowed in engine compartments presumably face similar harms in addition to the risk of being injured by engine heat or moving components. Severely overloading a vehicle is likely to make it more difficult to handle, thereby increasing the likelihood of an accident.

**[7]** Consistent with the examples in the application notes, our decisions have upheld § 2L1.1(b)(5) enhancements for vehicular travel only when the circumstances increased the likelihood of an accident or the chance of injury without an accident. *United States* v. *Hernandez-Guardado*, 228 F.3d 1017, 1027-28 (9th Cir. 2000), involved overloaded vans with passengers lying unrestrained on the floorboards. *United States* v. *Miguel*, 368 F.3d 1150, 1152 (9th Cir. 2004), involved the transportation of three individuals in the trunk of a car in 100-degree heat. In *United States* v. *Ramirez-Martinez*, 273 F.3d 903, 916 (9th Cir. 2001), *overruled on other grounds by United States* v. *Lopez*, 484 F.3d 1186 (9th Cir. 2007) (en banc), defendant was found to have transported "twenty people in a dilapidated van without seats or seat belts."

This case is most similar to *United States* v. *Dixon*, 201 F.3d 1223 (9th Cir. 2000), which involved the transportation of aliens in the hatchback area of a vehicle. *Id.* at 1233. We recognized that a hatchback—like the makeshift compartment in this case—is similar to the application note's example of a trunk in that neither is designed to transport people. A passenger riding there is therefore more likely to be injured in the event of an accident than someone riding in the same car who is securely strapped into a passenger seat. Nonetheless, we found that the incremental danger posed by riding in a hatchback was not so "obvious" as to render the overall danger "substantial" without additional evidentiary support.

**[8]** In addition to the application notes and our caselaw, we also consider the magnitude of the enhancement. Section 2L1.1(b)(5) raised defendant's offense level to 18—a 6-level increase. That's greater than the 2-level increase for recklessly endangering others while fleeing from law enforcement, *see* U.S.S.G. § 3C1.2 (2005), greater than the 2-level increase for using a minor in the commission of the offense, *see id.* § 3B1.4, greater than the 4-level increase for leading a criminal conspiracy, *see id.* § 3B1.1(a), and greater than the

4-level increase for causing death by possessing biochemical weapons, *see id.* § 2M6.1. The magnitude of the increase suggests that this enhancement is meant to apply only when the additional risk to the concealed passenger is significantly greater than the risks normally borne by ordinary passengers during normal vehicular travel. Here there was some additional risk, but only in the highly unlikely event of an accident.[9] We do not think that the incremental risk was significant enough to warrant doubling or even tripling defendant's sentence.[10]

The district court erred in applying the Guidelines to the facts of this case.[11]

\* \* \*

[9] Because a rational jury could not have convicted defendant of the lesser misdemeanor offense outlined in 8 U.S.C. § 1324(a)(2)(A), without also convicting him of the felony

---

[9]The probability of defendant getting in an accident was probably close to 0.03%. We calculate that probability based on the defendant's plan to drive 135 miles from the San Ysidro checkpoint to Marquez-Cruz's destination in Los Angeles, and the frequency of accidents in March 2005-203 crashes for every 100 million miles driven. Nat'l Highway Traffic Safety Admin., n.6 *supra*, at 44.

[10]The district court sentenced defendant to the bottom of the enhanced sentencing range of 30-37 months. The bottom of the un-enhanced sentencing range was 12 months.

[11]We recognize that there is an intracircuit conflict regarding how we review application of the Guidelines to the facts. *Compare United States* v. *Kimbrew*, 406 F.3d 1149, 1151 (9th Cir. 2005) ("This court reviews . . . the district court's application of the Sentencing Guidelines to the facts of this case for abuse of discretion."), *with United States* v. *Williamson*, 439 F.3d 1125, 1137 n.12 (9th Cir. 2006) ("We review the interpretation and application of the Guidelines de novo."); *see also United States* v. *Staten*, 466 F.3d 708, 713 n.3 (9th Cir. 2006) (recognizing the conflict). But because we would reverse even under the more deferential abuse of discretion standard, it is unnecessary for us to call the case en banc to resolve the conflict.

offense, the district court did not abuse its discretion in refusing to give a lesser-included instruction. But, because we conclude that the district court erred in finding that defendant was subject to a sentencing enhancement under U.S.S.G. § 2L1.1(b)(5) (2005), we vacate his sentence and remand for re-sentencing.

**AFFIRMED IN PART, VACATED IN PART AND REMANDED.**

---

IKUTA, Circuit Judge, concurring in part and dissenting in part:

I join section one of the majority's opinion, but dissent from its holding in section two. The majority's holding that the district court abused its discretion in determining that the U.S.S.G. § 2L1.1(b)(5) enhancement applied to Torres-Flores' offense is based on evidence not in the record and conflicts with our normal procedure for reviewing Guidelines sentences.

I.

Torres-Flores concealed Marquez-Cruz in a carved-out compartment located beneath the rear passenger seat of an extended cab pick-up. Torres-Flores' counsel estimated that the rear bench seat, which was placed over Marquez-Cruz's body, weighed approximately forty to fifty pounds (not accounting for the speakers and the child safety seat that rested on top of the bench seat during Marquez-Cruz's transportation). The bench seat was not bolted to the floor of the pick-up and Marquez-Cruz was placed in the compartment without any restraints. Photographs of the vehicle revealed protruding metal edges located at the sides of the carved-out compartment.

After examining color photographs of the vehicle and hearing extensive argument from the parties, the district court set forth detailed factual findings, which the majority does not dispute.

> [W]hen you get down to common sense, it's very simple: that there was an area that was carved out of the bottom. It's not smoothed out. It's not padded. There are some edges, and you can't tell how sharp the edges are, but there are edges if you look in Exhibit H, that color photograph, and Exhibit I. The person is in that compartment. He pulls the rug over him, and then he pulls the seat back over him. The seat is not bolted in place. And so moving back and forth, just the motion of the car runs the risk of the seat popping out and moving for the very reason that [the defense] argue[s] that [Marquez-Cruz] can lift the seat up with great ease. I mean that's just one thing.
>
> But one has to look at if there's a collision, and collisions happen, what's going to happen? The car is not going to be—the vehicle's not going to be in perfect shape where metal is not going to be bent. Metal bends. Things happen. Fires occur. Explosions occur. And this person is in a situation where he can't get out unless, even taking the facts in the light most favorable to [the defense], he pulls the rug back — assuming he wasn't injured and his head didn't hit one of the sides of the compartment here and he's still conscious — he has to pull the rug back, push the seat up, and then somehow get over the seat. The seat's now pushed against the driver's seat. Then get out of the vehicle when the clock is ticking and seconds are ticking and this vehicle can explode from a collision or there's other fire that happens in collisions. I wouldn't want to be in that situation.

Common sense tells me that that's a dangerous, a serious risk of personal injury or even death to ride in a vehicle that way. And I think that's what's meant.

The *Dixon* case is a really specific case that dealt with hatchbacks where one could get out very easily. This is not something that someone can get out to the degree of speed that one can get out with a hatchback. Again, if you look at the pictures, you see that there is uneven metal, it's not padded, and the person is leaned against that uneven metal. And this is a bad, bad situation. And it is one that the defendant was aware of. It was his compartment and clearly fits within intentionally, recklessly creating a sudden risk of death or serious bodily injury.

The facts are by proof beyond a reasonable doubt. No one's really disputing the facts. Whether you have to force the front seat up or force it are not really as irrelevant if you don't have to force it up. There[ ] are still a lot of obstacles to getting out of this vehicle in a crash, assuming that one can do it. [The defense] assume[s] [that in case of an accident,] . . . the vehicle's . . . going to be in the same condition that [it] is in now; it's not. If it's from the rear, especially from the sides, that person is going to be compressed. His head is going to be pushed against the compartment without any padding. He's not restrained at all. This is not a good situation.

So I hold the six-level increase is appropriate.

The district court's conclusion is entirely consistent with the plain language of the Guidelines. Section 2L1.1 addresses offenses involving the smuggling, transportation, or harboring of unlawful aliens. Subsection (b)(5) of that provision directs the sentencing court to increase the defendant's offense level

"[i]f the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person." U.S.S.G. § 2L1.1(b)(5) (2005). Application Note 6 further explains that § 2L1.1(b)(5) applies to "a wide variety of conduct," including: (1) "transporting persons in the trunk or engine compartment of a motor vehicle," (2) "carrying substantially more passengers than the rated capacity of a motor vehicle," and (3) "harboring persons in a crowded, dangerous, or inhumane condition." U.S.S.G. § 2L1.1 cmt. n.6 (2005).[1] As the majority recognizes, the plain language of § 2L1.1(b)(5) applies to transporting passengers in a way that "could increase the risk that an accident, if it should occur, would cause injury or death." *See* maj. op. at 11450.

Our case law has echoed the expansive language of the application note. Our prior decisions have held that "[n]o precise formula undergirds the determination of what constitutes substantial risk." *United States v. Carreno*, 363 F.3d 883, 890 (9th Cir. 2004), *vacated and remanded on other grounds*, 543 U.S. 1099 (2005). In this spirit, we have emphasized that district courts should "carefully evaluat[e] the cumulative effect of the interrelated factors supporting the enhancement" and "assess the degree of risk created by the totality of the defendant's conduct." *Id.* The Fifth Circuit has expressly held that transporting aliens in a manner that exposes them to a substantial risk of serious bodily injury in the event of an accident is sufficient to uphold a § 2L1.1(b)(5) enhancement. *See United States v. Zuniga-Amezquita*, 468 F.3d 886, 890 (5th Cir. 2006).

---

[1]Indeed, the language of Application Note 6 to U.S.S.G. § 2L1.1 is broad enough to cover the precise conduct in this case. The application note explains that the "wide variety of conduct" meriting the enhancement includes "harboring persons in a crowded, dangerous, or inhumane condition." U.S.S.G. § 2L1.1 cmt. n.6 (2005). This would include Torres-Flores' conduct in concealing Marquez-Cruz in a condition the district court correctly found to be "dangerous." *See* Webster's New World College Dictionary 647 (4th ed. 2005) (defining to "harbor" as "to serve as, or provide, a place of protection to; shelter or house; conceal or hide").

The district court made the common sense determination that transporting an alien unrestrained by a seatbelt, crammed into a hidden compartment, and placed under a forty or fifty pound bench seat which impeded his ability to exit posed serious dangers in the event of an accident. The conclusion that Torres-Flores' conduct created "a substantial risk of death or serious bodily injury to another person" was undoubtedly correct.[2]

## II.

The majority overturns the district court's straightforward application of the Guidelines on the ground that the likelihood of an accident was not significant enough to merit a 6-level enhancement in the offense level. Maj. op. at 11452-53. I disagree with this conclusion for two reasons.

First, the majority bases its conclusion that an accident was "highly unlikely," and therefore the district court erred in applying the enhancement, on the majority's *sua sponte* review of highway statistics that were not part of the record, and are at best inconclusive. *See* maj. op. at 11453 & n.9. Extrapolating from general National Highway Traffic Safety Administration statistics, the majority derives the surprisingly precise determination that the likelihood of Torres-Flores getting into an accident "was probably close to 0.03%." The majority explains that it "calculate[s] that probability based on the defendant's plan to drive 135 miles from the San Ysidro checkpoint to Marquez-Cruz's destination in Los Angeles, and the frequency of accidents in March 2005—203 crashes for every 100 million miles driven." Maj. op. at 11453 n.9.

The statistical information provided by the National High-

_____

[2]As the majority notes, there is an intracircuit conflict regarding whether we review the district court's application of the Guidelines to the facts of this case de novo or for an abuse of discretion. *See* maj. op. at 11453 n.11. I would affirm the district court under either standard.

way Traffic Safety Administration, and the majority's factual extrapolation from that information, were not in the record before the district court and should not affect our review. Appellate courts generally consider only the "record before the trial judge when his decision was made." *Kirshner v. Uniden Corp. of Am.*, 842 F.2d 1074, 1077 (9th Cir. 1988) (internal quotation marks omitted). Moreover, "[i]t is rarely appropriate for an appellate court to take judicial notice of facts that were not before the district court." *Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386, 392 n.7 (9th Cir. 2000). Even if such traffic statistics were an appropriate subject of judicial notice, *see* Fed. R. Evid. 201(b) (requiring that facts be "not subject to reasonable dispute"), it is inappropriate to rely on such data where the government has had no notice or opportunity to respond. *Cf.* Fed. R. Evid. 201(e) ("A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed."). Moreover, we have previously expressed doubt about relying on general statistics as proof of an ultimate issue in an individual case. *See Haugen v. Brosseau*, 351 F.3d 372, 389 (9th Cir. 2003) (relying on general statistics of the dangers of high-speed car chases was improper, given that the statistics were not supplied by the parties, or responded to by the party adversely affected; also noting the Supreme Court's rejection of this general statistical approach "to prove dangerousness in an individual case").

More important, the results of the majority's extrapolation are highly questionable. For example, the majority's analysis fails to take into account statistics showing that because Torres-Flores was a twenty-five year-old male, he was over 36 % more likely to be in a crash than the general population. Nat'l Highway Traffic Safety Admin., *Traffic Safety Facts 2005* 98 (involvement rate of 7,354 compared to 5,398). The majority's calculation also fails to take into account other factors that could affect the probability of Torres-Flores getting into an accident, including the effect of driving a light truck, driving where the speed limit was 55 miles per hour or higher,

driving near the city of Chula Vista, and driving in the state of California. *See id.* at 17, 51, 148, 176. It is a truism that statistics can be used to prove anything, and absent specific information for drivers transporting concealed aliens from San Ysidro to Los Angeles (information apparently not provided by the National Highway Traffic Safety Administration), the statistics relied on by the majority are simply not an appropriate basis for determining that the district court abused its discretion.

Second, I question the majority's analytical approach. The majority concludes that because the § 2L1.1(b)(5) enhancement resulted in a 6-level increase in defendant's offense level, the district court abused its discretion in determining that the § 2L1.1(b)(5) enhancement was applicable to the facts of the case. Maj. op. at 11452-53. But our determination as to whether a district court was correct in applying the law to the facts should not vary based on the size of the sentencing enhancement that results from this analysis. Torres-Flores himself concedes that "the guidelines do not suggest that the effect of the enhancement in terms of levels of increase to the base offense level should be factored into the substantive factual analysis." Although the disproportionate impact of an otherwise applicable sentencing factor may raise a need for additional procedural protections in fact-finding, *see, e.g.*, *United States v. Jordan*, 256 F.3d 922, 926 (9th Cir. 2001), Torres-Flores does not raise this issue. Under our procedure, if the sentencing factor is applicable by its terms, a court then turns to consider whether the sentence suggested by the advisory Guidelines is unreasonable in light of the § 3553(a) factors.[3]

---

[3]We follow "a two-step procedure for reviewing sentences imposed following the date the Supreme Court issued its opinion in *Booker*." *United States v. Mix*, 457 F.3d 906, 911 (9th Cir. 2006) (citing *United States v. Cantrell*, 433 F.3d 1269, 1279-81 (9th Cir.2006)). First, we determine whether the district court properly considered and applied the applicable Sentencing Guidelines. *Cantrell*, 433 F.3d at 1279-81. If the district court did not err in applying the Sentencing Guidelines, we review the sentence for reasonableness in light of the factors set forth in 18 U.S.C. § 3553(a). *Cantrell*, 433 F.3d at 1280. The majority seemingly conflates these two steps.

Here there is no basis to conclude that Torres-Flores' within-Guidelines sentence is unreasonable. *See Rita v. United States*, ___ U.S. ___ (2007).

The district court correctly applied U.S.S.G. § 2L1.1(b)(5) in determining that the transportation of Marquez-Cruz in an unprotected compartment with uncovered metal edges, unrestrained by a seatbelt, and prevented from ready egress by forty to fifty plus pounds of material "created a substantial risk of death or serious bodily injury." Therefore, I would affirm.